UNITED STATES

v.

Joseph L. THOMAS, 376 64 5006 Sergeant, (E–5), U.S. Marine Corps.

NMCM 89 1289.

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 8 Nov. 1988.

Decided 13 Oct. 1993.

Maj Joseph B. Gilbert, USMC, Appellate Defense Counsel.

Maj Richard T. McNeil, USMC, Appellate Defense Counsel.

Maj David S. Jonas, USMC, Appellate Defense Counsel.

Capt Michael K. Schaller, USMC, Appellate Defense Counsel.

LtCol Joseph S. Uberman, USMC, Appellate Government Counsel.

LCDR Lawrence W. Muschamp, JAGC, USN, Appellate Government Counsel.

Before JONES, J., REED, Senior Judge, and LAWRENCE, J.

LAWRENCE, Judge:

Appellant was convicted of the premeditated murder of his wife. Following the presentation of evidence on the sentence, the members unanimously found two aggravating factors beyond a reasonable doubt and sentenced appellant to be put to death. Appellant, then-petitioner, filed a Motion for Declaratory Judgment seeking an order from this Court declaring that his death sentence is illegal. After meeting with counsel, we agreed to consider that motion as an assigned error under Article 66(c), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866(c), and specified the following limited

issue for resolution at this stage of the appeal:[1]

Is the sentence adjudged in appellant's case *procedurally* correct in law and fact? If it is not, why is it not? If it is not, has the appellant been prejudiced? If he has, what is the appropriate remedy?[2]

We conclude that the competent evidence of record does not establish any procedural error affecting the findings or sentence that requires setting aside the sentence of death. Because appellant may now assign additional errors in the case to include appropriateness of the adjudged and approved sentence, we do not decide whether the findings or sentence should be affirmed.

## I.

Prior to the members' deliberations on findings, the military judge gave instructions that included this advice: "You may reconsider any finding prior to its being announced in open court. You may consider any finding of guilty prior to the sentence being announced. Should the question of reconsideration arise, let me know, and I will give you further instructions on that. The instructions are a bit lengthy." Record at 1467. At the conclusion of instructions on findings, the following exchange occurred between Lieutenant Colonel (LtCol) K, the senior member, and the military judge:

PRES [LtCol K]: I want to say, your instructions on reconsideration, if I understood correctly, we can have several ballots on the issue? We can reconsider at anytime up until the finding has been announced; and then, additionally, before the sentence has been announced?

MJ: That's right. If it comes up—if anybody wants to raise the issue that, "Hey, I want to talk about this, reconsider it," let me know and I'll give you the

instructions on it. I don't like to give them unless the issue arises.

Record at 1468–69.

Thereafter, the members deliberated, seeking no further guidance from the military judge before announcing their unanimous findings of guilty of the charge and specification. At a session outside the presence of the court members, defense counsel asked the military judge to ask the members how many times they voted before announcing their verdict. The military judge denied the request, finding no basis for the inquiry because the members had not requested further instructions on reconsideration after beginning deliberations. The military judge did agree to poll the members after announcement of sentence. After the president of the court announced a unanimous sentence of death, the military judge polled the members and established that each had reached the announced decision regarding findings, the aggravating factors, and the sentence. The military judge did not inquire whether more than one vote had been taken on the findings of guilty.

Trial was completed on 8 November 1988. The record of trial was authenticated on 25 January 1989, and copies were sent to defense counsel. After reviewing the record of trial, civilian defense counsel, retained after trial to act during review and appeal of the case, allegedly became concerned that multiple votes on findings may have occurred. Based on this perceived possibility, on 14 November 1989, more than a year after the completion of trial, the civilian defense counsel telephoned Staff Sergeant (SSgt) J, a court member, who according to counsel stated that perhaps six or seven votes were taken on the merits and many were taken during the sentencing phase of the trial. Military appellate defense counsel asserts that he also contacted SSgt J who confirmed this earlier statement.

---

1. We heard oral argument on the specified issue on 4 November 1991.

2. Following the decision to specify this issue, but prior to the oral argument, two of the three judges on this panel were transferred from the

Court and replaced. As a result, the focus of this opinion has shifted to the question whether the depositions of the members of the court-martial should be considered in the resolution of the specified issues.

Appellant provided this information to the Court by affidavits and suggested that unlawful command influence may have been brought to bear on the members who initially voted for acquittal. He requested, and the Court ordered, that the members be deposed. These depositions were taken in January of 1990, more than 14 months after the conclusion of the trial. In resolving the issues before us, we have the depositions of all court members except for one. At the time of the depositions, that one member had retired and on the advice of counsel exercised his purported "personal privilege to allow the deliberations to remain secret."

## II.

From the assigned issues and the information now before us we distill the following issues: (1) did the military judge err in his initial instruction to the court regarding reconsideration and in his answer to the president's question in that regard, and if so, was the error forfeited by trial defense counsel's failure to object to the instruction and answer, (2) should this Court consider the initial affidavits submitted by defense counsel and the subsequently obtained depositions from the court members, and (3) even if the affidavits and the depositions were considered, would they establish that multiple votes on findings occurred?

We hold that the military judge's initial instruction on reconsideration and his answer to the president's question were not erroneous. Even if they were erroneous, they were not plainly erroneous, and thus trial defense counsel's failure to object forfeited the issue for subsequent review and appeal of the case. Next, we conclude that the initial affidavits submitted by defense counsel merited at most only a limited inquiry to determine whether an exception contained in Military Rule of Evidence (Mil.R.Evid.) 606(b) for inquiry into the member's deliberations existed. The inquiry directed by this Court was more expansive than the rules permitted; however, this unwarranted breadth was to appellant's benefit. Considering the initial affidavits and the subsequent depositions, we find that no exception in Mil.R.Evid. 606(b) is shown; therefore, we decline to consider the

affidavits or depositions as a means to impeach the findings or the sentence. Finally, I conclude, without the concurrence of Judge Reed, that even if the instruction on reconsideration and the subsequent advice to the president were erroneous, if we were to consider the affidavits and the depositions pursuant to our authority conferred by Article 66, UCMJ, we would find that no multiple votes on findings or the sentence occurred. Accordingly, in my opinion, any error in failing to instruct that a nonunanimous finding of guilty may not be reconsidered for purposes of authorizing a capital sentencing proceeding would be harmless.

## III.

In explaining our holding, we first address whether the military judge's instructions regarding reconsideration and his response to the president of the court's inquiry constituted prejudicial error. We find no prejudicial error for three reasons: (1) Complete instructions regarding reconsideration are not required unless a member indicates a desire to reconsider, (2) the instructions given and military judge's subsequent advice were not erroneous, and (3) even if the instructions and his advice were erroneous, the error is forfeited due to the defense's failure to object.

First, Rule for Courts–Martial (R.C.M.) 920 lists required instructions on findings; reconsideration instructions are not included. A military judge is not required to give instructions on reconsideration of findings unless the need for such an instruction is apparent. *See United States v. Strawn*, 44 C.M.R. 703, 1971 WL 12610 (N.C.M.R.1971); *cf. United States v. King*, 13 M.J. 838 (A.C.M.R.), *petition denied*, 14 M.J. 232 (C.M.A.1982); *United States v. Cross*, 2 M.J. 1057 (A.C.M.R.1976), *petition denied*, 3 M.J. 108 (C.M.A.1977). An instruction is required if a member indicates a desire to reconsider, however, in this case the president's question arose prior to deliberations and therefore did not indicate such a desire. The accepted practice in courts-martial is to instruct prior to deliberation on findings that if any member desires to reconsider a finding, the military judge should be notified so that recon-

sideration instructions may be given in open court. The instruction given in this case is virtually identical to that contained in the Military Judge's Benchbook, Department of the Army Pamphlet 27–9, May 1982, ¶¶ 2–30, 55 (revised 10 October 1986) and the Navy–Marine Corps Judiciary Activity Recommended Members Trial Guide (1–87) p. 35. It clearly informed the members that reconsideration of a finding requires instructions on reconsideration that must be given in open court. The military judge's response to the president of the court's inquiry again made clear that reconsideration would require additional instructions from the military judge.

No decisional law or Rule for Courts–Martial contains a different rule for capital cases. The Discussion under R.C.M. 922(b)(2) states that a nonunanimous finding of guilty as to a capital offense may not be reconsidered in order to authorize a capital sentencing hearing, however, neither that rule nor any other requires that reconsideration instructions be given in all cases involving a capital offense.[3] Indeed, the general rule for criminal trials is that the fact-finder should not be informed of the sentencing consequences of the finding since doing so directs the fact-finder to a consideration that is irrelevant to the immediate issue. Thus, neither the initial instruction nor the military judge's subsequent advice is erroneous.

■ Second, trial defense counsel did not object to either the instruction or the subsequent advice. Both accord with consistent practice, thus, defense counsel could not have been surprised by them. R.C.M. 920(f) states that "failure to object to an instruction

or to omission of an instruction before the members close to deliberate constitutes waiver of the objection in the absence of plain error." This waiver rule is taken from Federal Rule of Criminal Procedure 30. The purpose of the rule requiring objection before the members close to deliberate is to provide the military judge with the opportunity to correct any errors in the instructions and to place responsibility on trial defense counsel to keep the record free of error. By failing to object, the accused forfeits any right to relief on review or appeal unless the error is plain, that is, clear and obvious, see United States v. Olano, —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), and materially prejudices the substantial rights of the accused, see Article 59(a), UCMJ; United States v. Toro, 37 M.J. 313 (C.M.A.1993).

■ Assuming arguendo that the instruction on reconsideration and the subsequent response to the president of the court constituted error, the error is certainly not clear or obvious. The bar to reconsidering a nonunanimous finding of guilty for purposes of imposing the death penalty is a procedural rule promulgated by the President that is not mandated by the U.S. Constitution or the Uniform Code of Military Justice, thus, any appellate reluctance to fail to notice a constitutional error is absent in this issue. Nothing in the record of trial establishes material prejudice to appellant from this alleged procedural error, and, as we explain below, we decline to consider the affidavits submitted by defense counsel or the responses to the post-trial interrogatories to the members in determining whether any prejudice resulted.

3. The Introduction to the Analysis of the Rules for Courts–Martial states that the "Discussion ... does not have the force of law, even though it may describe legal requirements derived from other sources." Manual for Courts–Martial, United States, 1984 (MCM), Introduction (b)(1), Analysis, Appendix 21, A21–3.

The inclusion of both the President's rules and the drafter's informal discussion in the basic text of the Manual ... should eliminate questions as to whether an item is required or only guidance. In this Manual, if matter is included in a rule or paragraph, it is intended that the matter be binding, unless it is clearly expressed as precatory.... On the other hand, if the drafters did not choose to "codify" a

principle or requirement derived from a judicial decision or other source of law, but considered it sufficiently significant that users should be aware of it in the Manual, such matter is addressed in the Discussion.... Id. The Analysis to R.C.M. 922(b) states that "the Rule and the Discussion also preclude use of the reconsideration procedure in R.C.M. 924 to change a nonunanimous finding of guilty to a unanimous verdict for purposes of authorizing a capital sentencing proceeding." MCM, 1984, Analysis, R.C.M. 922(b), App. 21, A21–62. We find nothing in the Rule to prohibit such a reconsideration. In this case, we assume arguendo that the prohibition contained in the Discussion has the force of law.

Finally, even if the military judge committed plain instructional error that resulted in actual prejudice to appellant, we doubt that the error is of such a nature as to "seriously affect the fairness, integrity or public reputation of the judicial proceedings," *see Olano*, —— U.S. at ——, 113 S.Ct. at 1779, or that failure to remedy the error would result in a miscarriage of justice, *see Toro* at 316.

IV.

■ After findings were announced, the defense counsel requested that the military judge ask the members how many times they voted prior to announcement. The military judge refused to ask that question. We review this decision employing an abuse of discretion standard and conclude that the military judge was well within his discretion in refusing to ask the members this question. Nothing indicated that multiple votes had occurred, and such questioning does not relate to the narrow, defined exceptions, discussed below, to the rule barring inquiry into the members' deliberations.

■ R.C.M. 922(e) prohibits polling of military court members. The rule provides that "except as provided in Mil.R.Evid. 606, members may not be questioned about their deliberations and voting." The rule is an intentional departure from federal practice based on Article 51(a), UCMJ, which requires that the members vote on findings by secret written ballot. Manual for Courts-Martial, United States, 1984 (MCM), Analysis, R.C.M. 922(e), MCM, App. 21. Fed.R.Crim.P. 31(d) provides that when the verdict is returned, but before it is recorded, the "jury shall be polled at the request of any party or upon the court's own motion." *Mackett v. U.S.*, 90 F.2d 462 (7th Cir.1937), cited in the Advisory Committee's notes on Rules, 1944 adoption, holds that the right of a defendant to poll the jury is substantial and when denied requires reversal. *Id.* at 466. The object of the poll "is to ascertain for a certainty that each of the jurors approves of the verdict as returned; that no one has been coerced or induced to sign a verdict to which he does not fully assent." *Id.* (citing *Humphries v. District of Columbia*, 174 U.S. 190, 19 S.Ct. 637, 43 L.Ed. 944 (1899)). The manner of

conducting the poll is within the sound discretion of the trial court, however, each juror should be asked individually whether the juror concurs on the verdict.

■ Assuming arguendo that the R.C.M. 922 prohibition on polling is inapplicable in capital cases in which a unanimous verdict and sentence must be reached to impose a death sentence, appellant is entitled to no relief based on the right to poll the members stemming from the military judge's refusal to question the members about this subject. First, the military judge did agree to poll the members. Second, the manner in which they were polled fully accords with the U.S. Constitution and the Federal Rules of Criminal Procedure.

In this case, each court member was asked *individually whether he concurred in the court's decision regarding "findings, the decision in regard to the aggravating circumstances, and the decision in regard to the sentence of the court." Record at 1533. Each member unequivocally responded in the affirmative.* At that point, there was no basis for expanding the poll by continuing the questioning. "A crucial assumption underlying [the system of trial by jury] is that juries will follow the instructions given them by the trial court." *Parker v. Randolf*, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979) (Rehnquist, J.), *quoted in Tennessee v. Street*, 471 U.S. 409, 415, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985) and *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983). "Surmise and suspicion may not be used to assail the integrity of the jury; it is presumed that jurors will be true to their oath and will conscientiously observe the instructions and admonitions of the court." *Ellis v. Oklahoma*, 430 F.2d 1352, 1356 (10th Cir. 1970), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1260, 28 L.Ed.2d 546 (1971); *see United States v. McKinney*, 954 F.2d 471, 478 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 662, 121 L.Ed.2d 587 (1992) (a presumption that juries follow court instructions is essential to the proper functioning of the trial system). A poll may not be used as a vehicle to intrude into matters that are protected from inquiry by Mil.R.Evid. 606. Asking the

members whether they reconsidered a binding vote, contrary to the military judge's instruction, is no less than asking whether the members adhered to their oath. *See United States v. Greer*, 620 F.2d 1383, 1385 (10th Cir.1980). Such a question intrudes into members' deliberations and may be justified only if persuasive evidence exists to warrant such an intrusion. At this point in the trial, a presumption existed that no impermissible reconsideration had occurred during the deliberations, and no facts tended to rebut that presumption. The military judge correctly denied the defense request and limited the poll of the members to its proper scope.

We therefore conclude that based on the record of trial alone no procedural errors occurred in the findings or the sentence that materially prejudiced the substantial rights of appellant.

### V.

We next decide whether the court-ordered depositions of the members now should be considered in the resolution of the specified issue. Initially, civilian defense counsel averred by affidavit that some time in November of 1989, about a year after the completion of this trial, he telephoned SSgt J, a court member, who said that multiple votes took place during deliberations on findings in this case. Military appellate defense counsel supported this averment through affidavit. Appellant requested, and the Government agreed, that the members should be deposed to determine if multiple votes were cast on findings. Lamentably, we agreed to this request and approved of questions that went far too broadly into the members' deliberations.

■■■ In general, "inquiries into jury verdicts and deliberations are looked upon with strong disfavor." *United States v. Voigt*, 877 F.2d 1465 (10th Cir.), *cert. denied*, 493 U.S. 982, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989). Mil.R.Evid. 509 states that "except as provided in Mil.R.Evid. 606, the deliberations of courts ... are privileged to the extent that such matters are privileged in trial of criminal cases in the United States district courts, but the results of the deliberations are not privileged." As noted previously, R.C.M. 922(e) prohibits questioning court members "about their deliberations and voting" except as provided in Mil.R.Evid. 606. R.C.M. 923 permits the impeachment of "findings which are proper on their face" only when an exception contained in Mil.R.Evid. 606 exists.

■■■ . These rules all refer to Mil.R.Evid. 606 to set out the rules for inquiry of court members that concerns their deliberations. Mil.R.Evid. 606(b) provides:

*Inquiry into validity of findings or sentence.* Upon an inquiry into the validity of the findings or sentence, a member may not testify as to any matter or statement occurring during the course of deliberations of the members of the court-martial, or to the effect of anything upon the member's or any other member's mind or emotions as influencing the member to assent to or dissent from the findings or sentence or concerning the member's mental process in connection therewith, except that a member may testify on the question whether extraneous prejudicial information was improperly brought to the attention of the members of the court-martial, whether any outside influence was improperly brought to bear upon any member, or whether there was unlawful command influence. Nor may the member's affidavit or evidence of any statement by the member concerning any matter about which the member would be precluded from testifying be received for these purposes.

This military rule of evidence mirrors Fed.R.Evid. 606(b) with one exception: inquiry may be permitted on the question whether there was unlawful command influence that affected the validity of the findings or sentence. This military exception is mandated by military decisional law. *See United States v. Accordino*, 20 M.J. 102 (C.M.A.1985); *United States v. Carr*, 18 M.J. 297 (C.M.A. 1984).

The Supreme Court examined the legislative history of Fed.R.Evid. 606 and explained its operative requirements in *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). At issue in *Tanner* was a petition for a new trial based in part on

the affidavit of the defense attorney. The affidavit stated that the attorney had received an unsolicited call from a juror who alleged that jurors consumed alcohol during lunch breaks and fell asleep during the trial. The defense also offered the affidavit of a juror alleging that members of the jury consumed a substantial quantity of alcohol during lunch recesses and smoked marijuana and ingested cocaine during the trial. The juror further contended that he observed jurors falling asleep during the trial. The Supreme Court was called upon to decide whether the District Court was required to hold an evidentiary hearing which would include juror testimony to determine whether the petitioner should be granted a new trial.

The Supreme Court first set forth the compelling reason for barring inquiry into jury deliberations:

> There is little doubt that post-verdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' unwillingness to return an unpopular verdict, and the community's trust in the system that relies on the decisions of laypeople would all be undermined by a barrage of post-verdict scrutiny of juror conduct.

483 U.S. at 120–21, 107 S.Ct. at 2747–48. These considerations are equally applicable in courts-martial which are convened by senior officers, the verdict and sentence in more important trials are well-publicized and often debated, and the community itself is often small and close-knit.

The Court noted that the Senate Report on Fed.R.Evid. 606(b) specifically rejected a portion of the House version that would have permitted impeachment of verdicts by inquiry into "what happened in terms of conduct in the jury room." 483 U.S. at 123, 107 S.Ct. at 2749. The Court also noted the Senate's

rejection of the deletion by the House of the proscription against juror testimony "as to any matter ... occurring during the course of the jury's deliberations." *Id.* at 124, 107 S.Ct. at 2749. The Court further pointed to the Senate's opinion that the House's deletion of this proscription "would have the effect of opening verdicts up to challenge on the basis of what happened during the jury's internal deliberations, for example, where a juror alleged that the jury refused to follow the trial judge's instructions...." *Id.* Finally, the Court noted that the Conference Committee adopted the Senate version of rule 606(b) which precluded "juror testimony about any matter or statement occurring during the course of the jury's deliberations." *Id.* at 125, 107 S.Ct. at 2750. Thus, the Court concluded that Rule 606(b) does not permit "jurors to testify on juror conduct during deliberations," *Id.*, and rejected appellant's request for a post-trial evidentiary hearing to inquire into the allegations of juror misconduct.

We find no decisional support in *Tanner* or its progeny that suggests that Rule 606(b) is inapplicable in cases involving the death penalty. *See Dobbs v. Zant*, 963 F.2d 1403 (11th Cir.1992), *reversed on other grounds and remanded,* —— U.S. ——, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993) (in habeas proceeding, defendant's claim that the jurors voted to impose the death penalty under a mistaken impression that defendant would not be executed was rejected because juror testimony regarding the deliberations is inadmissible under Fed.R.Evid. 606(b)); *Johnson v. State,* 593 So.2d 206 (Fla.), *cert. denied,* —— U.S. ——, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992) (testimony by the jury foreman was inadmissible under a state rule substantially the same as federal rule 606(b) because it concerned statements made during the jury's deliberations; the death sentence was affirmed); *Songer v. State,* 463 So.2d 229, 231 (Fla.), *cert. denied,* 472 U.S. 1012, 105 S.Ct. 2713, 86 L.Ed.2d 728 (1985) (testimony by a juror that she misperceived the judge's instructions concerning statutorily enumerated mitigating factors was inadmissible in a hearing to vacate the death sentence under an evidence rule substantially the same as fed-

eral rule 606(b)). Indeed, the policy considerations behind the rule are equally, if not more, pertinent in capital cases.

Cases subsequent to *Tanner* demonstrate that an appellant has the burden of showing that something was said or done during deliberations which falls under an exception contained in R.C.M. 923 and Mil.R.Evid. 606(b) that reasonably could have affected the verdict before appellant is entitled to depositions or in-court questioning of court members regarding their deliberations. *See Tejada v. Duggar*, 941 F.2d 1551 (11th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992); *United States v. Cuthel*, 903 F.2d 1381, 1382–83 (11th Cir. 1990); *United States v. Gravely*, 840 F.2d 1156, 1159 (4th Cir.1988). The allegations of defense counsel fail to raise any of these exceptions. Certainly, SSgt J did not allege that the announced verdict was not unanimous. By defense counsels' own account of their interviews of SSgt J, all he indicated is that the members were not unanimous on their first ballots on findings and thus failed to follow the judge's instructions requiring them to return to court for additional instruction relating to reconsideration. Such a failure would have been part of the deliberations of the members. Even prior to the adoption of the Military Rules of Evidence, post-trial affidavits alleging errors in voting procedures, to include erroneous reconsideration, were incompetent to impeach the findings. *United States v. Higdon*, 2 M.J. 445 (A.C.M.R.1975); *United States v. Perez–Pagan*, 47 C.M.R. 719, 1973 WL 14822 (A.C.M.R.1973); *United States v. Harris*, 32 C.M.R. 878, 1962 WL 4612 (A.F.B.R.1962). Mil.R.Evid. 606(b) clearly bars post-trial court member testimony pertaining to the method of the members' deliberations, and the Advisory Committee notes accompanying the rule "single out voting as such a 'component of deliberation.'" *United States v. Ortiz*, 942 F.2d 903, 913 (5th Cir.1991). If such testimony is barred, an affidavit to the same effect is equally proscribed.

Appellate defense counsel did contend that the affidavit suggested that unlawful command influence may have been brought to bear during the deliberations, yet nothing in the affidavits suggests this source of the purported violation of the judge's instructions. In his instructions on findings, the military judge instructed that "the influence of superiority in rank will not be employed in any manner in an attempt to control the independence of the members in the exercise of their own personal judgment." Record at 1465. As we stated previously, court members are presumed to have followed the court's instructions absent evidence to the contrary. There is nothing in the depositions that even suggests the possibility that superiority in rank or position had been employed by a member during the deliberations, thus, the affidavits provide no basis for inquiry of the members into the manner of voting or the number of votes taken.

*United States v. Ford*, 840 F.2d 460 (7th Cir.1988), illustrates, we believe, the proper manner of dealing with such post-trial allegations regarding alleged failure during deliberations to follow the judge's instructions on voting. The district court received a letter from a juror, 11 days after the conclusion of trial, claiming that improper behavior had occurred during deliberations by other jurors and the jury foreman. Among the allegations was that votes were taken prior to deliberations and that they were taken orally. The juror further contended that there had been "extreme and excessive pressure on individuals to change votes." *Id.* at 465. In spite of these claims, the District Court refused to hold a hearing to determine whether improper influences on jurors occurred during deliberations. The Court of Appeals affirmed this ruling based on the provisions of Fed.R.Evid. 606(b). The Court concluded that based on the rule "a court will not inquire into the jury's deliberative process, including ... votes, in the absence of a claim of external influence." *Id.* Because the letter involved only "intrajury influences on the verdict," no hearing was required.

The dissent acknowledges the general principles and holding of *Tanner* but suggests certain extraordinary situations that would constitute an exception to the *Tanner* ruling that might result in avoidance of the provisions of Mil.R.Evid. 606(b). One, substantial proof of complete juror incompeten-

cy, such as a jury made up of twelve blind drunks, certainly has no relevancy in this case. The second is the so-called "common-law egregious situation exception." Yet, even the dissent's cited basis for this undefined exception indicates that it might arise only in the case of such a serious impropriety as would constitute a denial of due process of law, thus, constitutional requirements would override the provisions of the rule. Rule 606(b), however, is an integral aspect of the Sixth Amendment right to a fair trial because "long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." *Tanner*, 483 U.S. at 127, 107 S.Ct. at 2751. Appellant's interests in proper voting procedures were protected by several aspects of trial procedure. The ability to understand instructions and the willingness of a court member to follow them may be explored during voir dire. Prior to instructions on findings, defense counsel is given an opportunity to submit proposed instructions. Had defense counsel been concerned that the standard instruction was inadequate or would mislead the members, counsel had the opportunity to request a different or more complete instruction. As noted previously, counsel also had the opportunity to object to the instruction on reconsideration and subsequent advice prior to commencement of deliberations, however, he did not do so. The voting error alleged in this case is not so egregious as to constitute a denial of due process of law, and the dissent points to no other constitutional provision violated in this case which might justify overriding the mandate of the rule.

The dissent further suggests that these affidavits indicate that the verdict announced was not the true verdict of the court-martial, thus, additional questioning beyond the poll conducted by the military judge was warranted. The poll itself, however, confirmed that the announced verdict was agreed to by each member of the court, and the affidavits fail to suggest that any member was coerced or induced to enter into the verdict.

There is a fundamental distinction between impeaching a facially valid, unanimous verdict and correcting an announced verdict that based on the poll does not reflect the vote of the members. *United States v. Love*, 597 F.2d 81, 85 (6th Cir.1979). Inquiry into the procedures for reaching a facially valid, unanimous vote on the guise of determining if the announced verdict is the "real" verdict is no more than a subterfuge to effect an otherwise impermissible intrusion into the members' deliberations. Even in cases wherein there is some indication that the announced verdict does not reflect the opinion of the members, further inquiry is limited solely to determining whether the announced verdict expresses the decision of each juror. If it does, the inquiry ends. If it does not, the judge must decide whether to continue the deliberations, perhaps with additional instructions, or declare a mistrial. At that point, the judge may in the exercise of his discretion conduct additional limited inquiry to determine the source of the error. Even in making this inquiry, the questions must be directed to whether the error resulted from a cause that can be corrected by additional instructions and renewed deliberations or whether its cause requires declaration of a mistrial. The inquiry is not a license to ignore the provisions of Mil.R.Evid. 606(b).

In fact, if accepted, the contention of the dissent might well consume the rule. During deliberations, court members must vote by secret written ballot. The junior member is to collect and count the votes and then present them to the president of the court who announces the result. Based on the reasoning in the dissent, it could be argued that a vote that was not secret results in a defective verdict. Following the reasoning of the dissent, if a member after trial alleges that the vote was not conducted in secret, further inquiry would be permitted, not just to determine if an impermissible influence infected the deliberations but also to determine the manner in which the members voted. Pressing this reasoning even further, if a member alleged after trial that the votes were collected by a non-junior member and given to the president who conducted his own count, in contravention of standard military voting instructions, the deliberations would be thrown open to an inquiry into the manner in which the members complied with the judge's instructions on voting. The dissent cites no

precedent for this contention, and we find none.

We now concede that initially we should have examined these assertions, unsupported by any evidence in the record of trial, only to determine if they reasonably raised an exception listed in Mil.R.Evid. 606(b). "Regardless of the method of inquiry into allegations of misconduct by court members, a privilege concerning their deliberations will limit the scope of the inquiry." *United States v. Stone*, 26 M.J. 401 (C.M.A.1988) (citing Mil. R.Evid. 606(b) and *Tanner*). Had we done so, we surely would have concluded that SSgt J's allegation, standing alone, in no way raised any of the three general exceptions. This conclusion would have precluded any further inquiry into the members' deliberations or further consideration of defense counsel's allegations, as we explain below. *See United States v. Motsinger*, 34 M.J. 255 (C.M.A.1992).

Nonetheless, in our attempt to purge even a suggestion of unlawful command influence and pursuant to our broad authority granted by Article 66, UCMJ, we ordered depositions of the members. They should have been drafted only to determine if a Mil.R.Evid. 606 exception existed which would permit additional inquiry, for unless an affidavit or other testimony clearly relates to one of the three exceptions in Mil.R.Evid. 606, a court may not consider it. *See Motsinger*. In cases in which the affidavit or testimony alleges that erroneous procedures were followed in voting on the findings or sentence, *see United States v. West*, 23 U.S.C.M.A. 77, 48 C.M.R. 548, 1974 WL 13855 (1974) (involving an affidavit alleging erroneous procedures in sentence deliberations), any inquiry must be limited to the source of the procedure, not whether the erroneous procedure occurred, especially when the procedural rule allegedly violated is not constitutionally required. The interrogatories in this case went well beyond their proper scope and compromised the members' deliberations.

▆▆▆ Thus, appellant has been granted a singular opportunity to establish a basis for our consideration of these affidavits and depositions. The central issue now before us is whether we now may consider these materials under the law. Nothing in any of these documents reasonably raises any exception contained in Mil.R.Evid. 606(b). All the affidavits and the responses suggest is that the court-martial members did not follow the trial judge's instructions on balloting or reconsideration. The fact that we ordered the interrogatories is of no consequence. Even if the minimum threshold requirement to justify a post-trial inquiry into alleged juror misconduct during deliberations has been met, unless the subsequent limited inquiry results in evidence falling under one of the exceptions contained in the rule, under existing law neither a federal nor a military court may consider it. We conclude that the affidavits and depositions are incompetent to impeach the findings in this case, therefore, we do not consider them. We also decline to exercise any authority we may have pursuant to Article 66, UCMJ, to disregard the clear mandate of Mil.R.Evid. 606(b) and grant appellant relief regarding this issue. *See United States v. Claxton*, 32 M.J. 159 (C.M.A. 1991).

## VI.

Judge Reed concurs in this result but is understandably reluctant to discuss the affidavits or responses to the depositions. The Supreme Court in *Tanner* did so, however, on the contingency that a common-law exception might apply to allow their consideration. Further, because this issue may arise in future capital cases, I conclude that the interests of justice require its earliest appellate resolution—remand to this Court for fact-finding pursuant to Article 66, UCMJ, would substantially delay that appellate resolution. Additionally, *Claxton* arguably permits this Court to disregard Mil.R.Evid. 606 and grant relief in the interests of justice if the affidavits and depositions establish that multiple votes were taken in contravention of the military judge's instructions. Lastly, because the Court of Military Appeals has not decided whether in a capital case the military judge must instruct on the bar against reconsideration to permit a capital sentencing proceeding, I conclude that in this case we should exercise our Article 66, UCMJ, fact-finding authority to determine whether mul-

tiple voting occurred. In my opinion, such an examination would show that no multiple votes on findings that would invoke reconsideration procedures occurred, thus any instructional error would be harmless.

As noted previously, the military judge clearly instructed that multiple balloting would require the members to return to open court for further instructions. This instruction was further buttressed and clarified by the military judge's additional instruction, in response to a question by the president of the court, that the members could not reconsider a finding without informing the judge that they desired to do so and receiving additional instructions. After the instruction and this advice, undoubtedly each member was aware that reconsidering a finding without receiving further instructions clearly was contrary to the instructions that they had sworn to follow.

The court was composed of nine members. At the time of the depositions, one member had retired and on the advice of counsel exercised his purported "personal privilege to allow the deliberations to remain secret." In their depositions, a majority of the court composed of the president of the court and four other members said that only two votes were taken, one vote on the specification and one on the charge. They indicated those votes were unanimous. Although the affidavits by counsel indicate that SSgt J told counsel that multiple votes took place, in his deposition, SSgt J denied ever having made such a statement to counsel and declared that no multiple voting occurred. Only a minority of three members indicated that multiple votes were taken, although even these members agree that the final vote was unanimous. Close examination of the responses of the minority does not establish that multiple voting occurred.

The response to the interrogatories of Lieutenant Colonel (LtCol) R is the easiest to resolve. The deposition officer began by asking if the members voted more than once on the specification, to which the member responded, "I honestly don't remember." The deposition officer continued:

Q. Do you have any questions about what I am asking? I'm basically—we're asking questions about the voting as far as the findings go as to the specification and the charge—

A. Uh-hum.

Q. —and that is all the questions we are going to deal with. You don't remember?

A. Well, bear in mind with a faulty memory, I believe we voted twice with a break in between there where we talked to the Judge. But, my mind is not perfectly clear on that.

Q. Well, when I talk about voting, normally under the way a court-martial is conducted, voting would be by secret written ballot so that's what I am focusing on. You know, how many times was a secret written ballot done in the case—under the specification of the charge. Does that help you refresh your memory any more?

A. Again, I believe it was only twice with a break in between where we spoke to the Judge.

Q. So you're saying it's possibly twice?

A. Yes.

Q. So that would mean you would have written your vote on one piece of paper and then there was some discussion and later you were with the Judge, and then you came back and voted on another piece of paper?

A. That's correct.

Depositions at 21–22. LtCol R could not recall why the multiple votes were taken or whether each resulted in a unanimous finding. He believed that the members voted once on the charge, and that vote was unanimous. The record of trial was unavailable at the deposition. The member indicated that if he "knew what the purpose was why we went to see the judge again, I just don't recall what that was. I think that would bring it all back in clarity here." *Id.* at 23.

The record of trial does in fact clarify these responses. It shows that after receiving instructions and taking a brief recess the court closed to deliberate. They returned with the findings about six hours later. At no time did they come back into court for any session during these deliberations. First, it is apparent that, due to an understandably faulty memory, when he spoke of multiple

voting he remembered first the vote on findings and then the one on sentencing. This is the only reasonable explanation of why he remembered voting, returning to court to see the judge again, and then voting thereafter. Second, accepting arguendo the unlikely conclusion that LtCol R's memory is accurate, the fact that there was only one vote on the charge is some evidence that earlier votes were meant only to be preliminary, nonbinding straw polls, as is discussed in greater detail below. Third, LtCol R could not say with any certainty that any vote on findings was not unanimous. This hazy recollection of what occurred well over a year before the depositions were taken is not persuasive evidence that the members violated their oaths by reconsidering a finding without seeking further instructions from the judge.

Captain H admitted in his deposition that his memory of the trial was not clear. He stated his belief that during deliberations there were perhaps two or three votes by secret written ballot on the specification under the charge. He said that on the first or second vote perhaps two of the members voted not guilty. On the last vote on the specification, the members unanimously reached a finding of guilty. When the deposition officer inquired if multiple voting took place on the charge, Captain H asked what the difference was between the specification and the charge. After the deposition officer explained the difference, the member said that as best he could remember there was one vote on the charge, and that vote was unanimous.

Captain H's stated reasons for this purported multiple voting are revealing. He said that they voted more than once to avoid being a "hung jury." He had understood that a hung jury was "a jury that has not reached a unanimous conclusion." When asked why multiple votes were taken, he explained:

A. Nobody—well—as I recall, there's no one who directed us to have it. Well—I don't know what our discussions were on that. Again, we voted, we discussed, we voted, and we discussed and we voted. And my feeling was and I don't think there was any discussion on why we're voting

again, it was my understanding—I felt it was the under—I think, thinking back, I feel it was the understanding of the rest of the members of the panel, that we are revoting just to ensure that is in fact our decision. Whatever the count was—eight and one or seven and two, if in fact that's how we felt.

Depositions at 8.

Major C testified that the members voted perhaps two or three times on the specification. In the earlier vote or votes, perhaps one or two members voted not guilty, however, on the final vote all members voted for a finding of guilty. He said that multiple votes also occurred on the charge. In explaining why multiple votes were taken, Major C said that the members "had some questions—things that weren't answered hadn't been discussed, so we had to continue further deliberations to determine if everything has been covered, and that's why we voted more than once." Depositions at 2.

MAJ [C]: It had to do with the evidence—it had to do with some additional questions that weren't—that had come up that weren't brought up at that time. Not necessarily that it would have made a difference, per se, but it was questions in individuals' minds. Since this was a murder case everybody wanted to make sure that everything was covered, and all of the evidence was thought out before any decision—final decision was made.

*Id.* at 2–3.

In answering whether the vote was unanimous, Major C said that not all votes were unanimous. He said:

If it had been unanimous, we wouldn't have continued on, as far as the specification goes. I think we had one—one or two—if I remember it—one or two votes that were "not guilty" at that time, and that was due to—to continue on—more questions that had came up—that they wanted to cover more in detail. The final vote, of course, when we finally did come to it, was, you know, unanimous.

*Id.* at 3.

He concluded his explanation of why multiple votes were taken on the charge as follows:

We went through it basically the same as the—the other vote. Any questions they had—the panel was taking this very seriously, and—and we really wanted to make sure, and the individuals wanted to make sure that everything was answered, and everything was done before we finally come up with a verdict, and that's the reason that—. We felt we had come up to a time that we could possibly vote for a verdict, and yet there was still some questions. Of course, nobody was going to say that until after the vote. They were—they had questions, but they were still in their heads, and they decided that they were gonna continue on with more deliberations. *Id.* at 7.

In examining these depositions, one fact is obvious. Whatever occurred in voting on findings, nothing in the process resulted from outside influence or the use of superiority in rank or position by any court member. Additionally, these three depositions are similar in that they demonstrate each members' inability to recall clearly how the voting was done. Captain H and Major C apparently had even forgotten that unanimity was not required for a finding of guilty. Their recollection of multiple voting easily could have resulted from the fact that voting occurred both on findings and sentence, and they have confused the two proceedings.

 Even if these three depositions were accepted as being factually correct, appellant is entitled to no relief since members during deliberations may conduct informal, non-binding votes if this procedure is done through the common consensus of all the members. *United States v. Lawson,* 16 M.J. 38 (C.M.A.1983). "Straw polls" are permitted by military law. *Id.* at 41. The essence of a straw poll during deliberations is that it is a non-binding vote taken to determine the members' tentative position prior to subsequent discussions before the final binding vote that will determine the finding. The preferred method of conducting such a poll is through a written ballot rather than orally because the danger that influence of superiority in rank will be employed improperly is lessened by the secrecy of the written ballot. *Id.* There is no requirement that reconsideration procedures follow a straw poll which is taken prior to a binding vote on findings.

The very fact that the members would have taken multiple votes without seeking an instruction on reconsideration is evidence that they did not perceive any preceding votes to be binding or final. Captain H said that the members collectively chose to vote, discuss additional matters, vote again, continue discussions, and then vote again. According to him, the members re-voted to determine finally what their decision on findings was. By his account, the members did not perceive of the earlier votes as binding or final. Major C's testimony strongly indicates that any earlier votes were straw polls only. He said that when the earlier votes were taken certain questions remained to be resolved and that they continued to vote to make sure that all matters had been discussed. The earlier votes were taken at a time when additional unanswered questions were to be discussed after the votes were taken. This was done to ensure that all matters were covered before a final decision was made. Clearly, if a vote is taken in full recognition that certain questions remain unanswered and will require additional discussion before the final verdict, the earlier vote is no more than a tentative, non-binding straw poll properly conducted in writing. Maj C said that when they came to the final vote it was unanimous.

The dissent indicates that if, after consideration of the affidavits and responses to the interrogatories, there is a reasonable doubt of the "reliability of the death-determining process," the sentence of death should be set aside. This contention seemingly means that if there is a reasonable doubt, after considering the affidavits and depositions, whether reconsideration took place contrary to the military judge's instruction, the sentence of death must be commuted to life imprisonment. Such a standard resembles that in appellate review of constitutional errors which require reversal unless they are found to be harmless beyond a reasonable doubt. In my opinion, this is not the correct standard.

Based on the presumption that the members adhered to the military judge's instruc-

tions, and the general presumption of the validity of a verdict, the affidavits and depositions must be sufficient to meet appellant's burden of establishing that error prejudicial to his substantial rights occurred. They fall well short of satisfying that burden. Nothing before us indicates that these latter statements were the result of unlawful influence or coercion. The responses of the three members who believe that multiple votes took place are unpersuasive due to the lapse of time between the conclusion of trial and the depositions, their obvious confusion by the questions, and their admittedly poor memories of the deliberations. Such evidence is strongly and conclusively rebutted by the presumption that the members adhered to the military judge's clear instruction and advice regarding reconsideration and the responses of the majority of the court-martial who state with greater certainty that no multiple votes occurred. Appellate consideration of all the evidence by this Court should result in a finding that no multiple votes on the specification or the charge occurred. Further, even if multiple votes were taken, the depositions themselves show that the earlier votes were non-binding straw polls that did not require the completion of reconsideration procedures prior to the final binding vote on findings. Thus, even if the affidavits and the depositions are considered, they fail to establish any error that merits relief.

## VII.

This issue stems from a basic inadequacy in military trial procedure. It began with defense counsels' communications with a court member to discover how voting on findings occurred. Under existing military law, such post-trial contact was not unethical or unlawful, but it should be. Voting on findings and sentence is a part of the members' deliberations. It takes place in secrecy, outside the sight or hearing of anyone but the members themselves. Permitting counsel or a party to intrude into such deliberations by questioning members after trial

about their adherence to instructions results in lessened public confidence in the court-martial system and intrudes into a process that must remain secret, except for a few narrow exceptions, to grant court members the independence and discretion needed to arrive at a verdict free from fear of public or private criticism or retribution.

The standard advice given by the military judge to the members that they must not disclose the "voice or vote" of any other member is inadequate, vague, and misleading. In this case, defense counsel obviously felt free to intrude into the members' deliberations so long as the member was not asked how other members voted or what their opinions or reasoning was. The protection of court members' deliberations must be substantially greater than that. If one member of a three or four-member special court-martial reveals that he voted to acquit the accused or voted against the sentence adjudged, the votes of the other court members have been made public. Questioning court members to determine whether they followed the judge's instructions opens all of the members to public scorn and ridicule and impeaches the verdict or sentence as much as discovering how the members thought, felt, or reasoned.

In the federal courts, local court rules commonly prohibit post-trial questioning of court members, without leave of court, about anything said or done during the jurors' deliberations. *See e.g. United States v. Hooshmand,* 931 F.2d 725 (11th Cir.1991) (upholding the district court's refusal under Local Rule 16 E of the Southern District if Florida to permit post-trial interviews of jurors and upholding the constitutionality of the rule); *United States v. Davila,* 704 F.2d 749 (5th Cir.1983) (upholding the district court's refusal under Local Rule 500–2 (set out in footnote 6) of defendants' request to interview the jurors after the verdict).[4] The Supreme Court in *Tanner* tacitly approved such rules and stated that the juror affidavit submitted "was obtained in clear violation of

---

4. We do not decide whether a military judge has inherent authority to order that all post-trial questioning of court members be conducted under the control and supervision of the trial court or an appellate court. *See King v. United States,*

576 F.2d 432, 439 (2nd Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978); *United States v. Brasco,* 516 F.2d 816, 819 n. 4 (2nd Cir.), *cert. denied,* 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975).

the District Court's order and the court's local rule against juror interviews, MD Fla. Rule 2.04(c); on this basis alone the District Court would have been acting within its discretion in disregarding the affidavit." Had such a rule existed to control defense counsel in this case, this issue would not have arisen.

Military law should provide that at the conclusion of trial, court-martial members shall be instructed that adherence to their oath requires that they refrain from and refuse to divulge any information about what was said or done in the course of deliberations unless directed to do so by competent judicial authority. Further, a uniform rule for all services should bar post-trial questioning of the members by counsel or a party without leave of the trial court or, if the record has been authenticated, leave of an appellate court. This rule would prevent questioning of court members, sometimes well after trial as occurred in this case, that results in statements or allegations that undermine confidence in the correctness or fairness of the verdict or sentence but which, due to the court members' faulty memory or conflicting statements, may defy adequate resolution during appellate proceedings conducted long after trial. We point again to the observation in *Tanner* that "allegations of juror misconduct ..., raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process." 483 U.S. at 120, 107 S.Ct. at 2747. In fact, the allegations raised in this case have delayed substantially the appellate process and have the clear tendency to undermine the trust of civilians and servicemembers in the court-martial system. Neither the Constitution, the law, nor common sense require continuation of this unsatisfactory situation in military courts.

## VIII.

Because we decline to grant relief on the basis of the limited specified issue, the case continues to involve an approved sentence of death. Because this issue was briefed, argued, and resolved prior to our considering any other assignments of error by appellant, we do not decide whether the findings or sentence should be affirmed. By separate order, we will require submission of any additional assignments of error in accordance with the applicable court rules.

REED, Senior Judge (concurring in part):

I concur with the lead opinion insofar as Judge Lawrence concludes (1) that the military judge's initial instruction on reconsideration and his answer to the president's question were not erroneous; and (2) that the affidavits submitted by defense counsel merit only a limited inquiry and that only to determine whether the exceptions, contained in R.C.M. 923 and Mil.R.Evid. 606, for inquiry into the members' deliberations existed. Like Judge Lawrence, I conclude that none of the exceptions in R.C.M. 923 or Mil. R.Evid. 606(b) is shown. Therefore, I concur with Judge Lawrence that the Court may not consider the affidavits or depositions as a means to impeach the findings or the sentence in this case. *See United States v. Motsinger*, 34 M.J. 255 (C.M.A.1992). Having reached this conclusion, I believe no further inquiry is necessary.

Although not required in the resolution of the issue before the Court, Judge Lawrence's remarks in Part VII of his lead opinion are well-reasoned and I endorse them.

JONES, Senior Judge (dissenting):

At the outset, it is important to recognize what this case is not. It is not, as most of the case law suggests, the result of a juror second-guessing himself after trial as to his role in returning a verdict of guilt. In such cases, whether the seed of doubt has arisen naturally or been sown by trial defense counsel, that juror may often come forward to provide an affidavit as to any misgivings he might harbor. This case however, is one that has traveled a tortuous path in its post-trial life, spurred on by concerns over latent command influence, and shepherded along the way under this Court's supervision. The result is not the single affidavit of a disgruntled juror, but the sworn testimony of three military court members whose credibility is without question, and who provide substantial evidence that multiple voting on the findings of premeditated murder took place.

As I will discuss, relief from the death penalty is required under any of three grounds: (1) the military judge erred in refusing to entertain appellant's military due process right to a poll of the members on whether their binding vote on the finding of guilty was initially unanimous; (2) under the facts of this case, the military due process right of a serviceperson not to be sentenced to death except by a reliable death-determining process overrides the interest of Mil. R.Evid. 606 in preserving any secrecy in the number of votes taken by the members; and (3) based on the sworn depositions provided, there can be no certainty that the ultimately unanimous vote of the members constituted their initial and thus "true" vote, so as to have permitted the case to continue in its potential for capital punishment.

## I.

After the discussion between the court president and the military judge on the possibilities for reconsideration of the finding of guilty, as noted by the lead opinion, the members deliberated, seeking no further guidance from the military judge before announcing their unanimous finding of guilty of the charge and specification. Thereafter, defense counsel requested the military judge to query the members as to the number of times they voted before announcing their verdict. The military judge denied the request, finding no basis for the inquiry for the

reason that the members had not requested further instructions on reconsideration after beginning deliberations. The military judge did agree "after announcement of sentence, [to] ascertain that is the agreement of all the court members." Subsequently, he polled the members to determine that each had, in fact, reached the decision as to their finding of guilty, the necessary aggravating factors, and the death sentence. At no time did he inquire whether more than one vote had been taken on the finding of guilty.

The judge omitted in his truncated, but commonplace, response to such a general question dealing with reconsideration, any explanation to the members that although they could reconsider their nonunanimous finding of guilty, that if they were to do so, a capital sentence was no longer authorized.[1] Rule for Courts–Martial 922(b)(2) and accompanying Discussion; *but cf. United States v. Perez–Pagan,* 47 C.M.R. 719, 1973 WL 14822 (A.C.M.R.1973).[2] Thus, there is no indication of record that the members were on notice of the virtual life-and-death significance of their initial vote on findings. Because I do not find that the judge's omission necessarily resulted in plain error, I would entertain the question of prejudice and the means by which it has been asserted in the assigned error before us.

## II.

As a result of his review of the record of trial, appellant's civilian appellate defense

1. Although I would not fault the military judge for his standard, shorthand response—a response that may be deemed adequate in non-capital cases—it seems to me prudent for trial judges presiding over future cases involving the potential for imposition of the death penalty to ensure that the members clearly understand (1) that full discussion must *precede* any *binding* vote on the findings and (2) that if a nonunanimous finding of guilty initially results, a reconsideration of that finding that seeks to attain a unanimous verdict will not authorize a capital sentencing proceeding. *See* Rule for Courts–Martial 922(b)(2), Discussion.

2. Under the facts giving rise to the decision in *Perez–Pagan,* defense counsel had obtained the affidavit of a member that four ballots had been taken in closed session and that no secret written ballots on the question of reconsideration of the findings of not guilty had been undertaken. The court recognized that there was no adequate procedure to ensure compliance with the recon-

sideration provisions of then paragraph 74(d)(3), Manual for Courts–Martial, United States, 1969 (Revised edition).

Notwithstanding that, and though the affidavit was corroborated by the earlier discovery of numerous ballots found in the deliberation room, the court refused to consider the affidavit, citing the policy considerations underlying the then proposed Rule 606(b) of the Rules of Evidence for United States Courts and Magistrates.

I would distinguish our case from that of *Perez–Pagan* because (1) although the offense referred was also premeditated murder in violation of Article 118, UCMJ, the members convicted the accused of unpremeditated murder—rendering the case non-capital, and (2) because there was no assertion that the judge erred in his instruction on reconsideration as here; *cf. United States v. Boland,* 20 U.S.C.M.A. 83, 42 C.M.R. 275, 1970 WL 7070 (1970) (judge's incorrect instruction that a vote for reconsideration of any finding

counsel contacted Staff Sergeant (SSgt) J, who as the junior member, would have been responsible for collecting and tallying the secret written ballots utilized during the guilt-determining phase of trial. After cautioning SSgt J not to divulge his particular votes or remarks or those of any other member, counsel asked if SSgt J recalled the number of ballots taken in the determination of guilt. SSgt J replied that many votes had been taken during both the guilt and sentencing phases of the trial, but that he could not recall the exact numbers. Subsequently, appellant's military appellate defense counsel telephoned SSgt J. After again being advised not to disclose the vote of any particular member, SSgt J reiterated that the members had voted several times at each phase of the trial.[3]

Appellant, suggesting that unlawful command influence may have been brought to bear on the members who initially voted for acquittal, requested, and the Court ordered that the members be deposed.[4,5]

How many votes favored guilt and how many favored not guilty, if the panel voted more than once? The Government joined in appellant's request, but objected to petitioner's proposed questions, and suggested seven other questions. The Court ordered depositions on 29 December 1989, which in essence, combined the interrogatories suggested by both appellate defense and government counsel.

The following interrogatories were propounded to the members:

1. Did the court-martial members vote more than once on the Specification alleging premeditated murder of Melinda J. Thomas by repeatedly striking her about the head with a blunt instrument?

a. If the panel voted only once on this Specification, was the vote unanimous in favor of a finding of guilty?

b. If the panel voted more than once on this Specification, what was the reason for voting more than once? How many times did the panel vote on this Specification? Was the vote unanimous in favor of a finding of guilty each time the panel voted on this Specification? If not, then, without disclosing your vote or opinion, or that of any other member, how many votes favored a guilty finding and how many favored a not guilty finding each time the panel voted on the Specification?

2. Did the court-martial members vote more than once on the Charge alleging violation of Uniform Code of Military Justice, Article 118?

a. If the panel voted only once on this Charge, was the vote unanimous in favor of a finding of guilty?

b. If the panel voted more than once on this Charge, what was the reason for voting more than once? How many times did the panel vote? Was the vote unanimous in favor of a finding of guilty each time the panel voted on this Charge? If not, then, without disclosing your vote or opinion, or that of any other member, how many votes favored a guilty finding and how many favored a not guilty finding each time the panel voted on the Charge?

---

could be completed orally constituted prejudicial error).

3. The military case law is without adequate direction on the question of counsel inquiries of court members post-trial, though that of the civilian sector is rife with the perils, and at times windfalls, of such a practice. *See, e.g., Government of Virgin Islands v. Nicholas,* 759 F.2d 1073 (3rd Cir.1985); *but see Parker v. Gladden,* 385 U.S. 363, 366, 87 S.Ct. 468, 471, 17 L.Ed.2d 420 (1966) (Harlan, J., dissenting). *See also United States v. Boland,* 22 M.J. 886, 888, n. 2 (A.C.M.R. 1986); *United States v. Heimer,* 34 M.J. 541 (A.F.C.M.R.1991).

While the propriety of such post-verdict interviews has been the subject of some question, there is no doubt that the practice has been widespread. Comment, *Impeachment of Jury Verdicts,* 25 U.Chi.L.Rev. 360 (1958). As that comment indicates, the Professional Ethics Committee of the American Bar Association has said that post-verdict interviewing of jurors by counsel, for the purpose of informing counsel as to any mistakes counsel may have made in the presentation of evidence or in testing counsel's judgment in selecting members of the panel is improper. Opinion 109, March 10, 1934, Opinions of the Committee on Professional Ethics and Grievances 230 (1947); *contra,* Opinion 107, Jan. 14, 1952, Committee on Professional Ethics, Association of the Bar of the City of New York. *Id.* at 365, n. 45.

Neither the Navy–Marine Corps Trial Judiciary Trial Guide, January 1987, nor the Military Judges' Benchbook, Department of the Army Pamphlet 27–9, May 1982, provides any guidance to the members departing the courtroom on their obligations and responsibilities respecting the deliberative process. In fact, their only guidance is part of the oath itself, given when they initially enter the courtroom—that each member will not "disclose or discover the vote or opinion of any particular member of the court-martial upon the findings or sentence unless required to do so in due course of law." Trial Guide at 19; Benchbook at 2–22. No guidance was provided by the judge in this case either.

This is an area that requires standardization by court rule from within the trial judiciary.

4. The appellant proposed that only two questions be asked of the members: (1) How many times did the panel vote on the issue of guilt? and (2)

5. See note 5 on page 644.

The depositions of Lieutenant Colonel K, Lieutenant Commander R, Master Gunnery Sergeant S, and Gunnery Sergeant J, each provided that there had been a single vote taken on first the Specification and then the Charge of premeditated murder. On each of those two votes, their depositions state that the vote was unanimous. Staff Sergeant J, who according to the defense affidavits provided the first indications of multiple voting, upon being deposed, stated that there had been but a single vote on the Specification and the Charge, and that each had been unanimous. Staff Sergeant J related that he had not answered an unidentified defense counsel's questions as to the number of votes taken, and that he thereafter had come to see the prosecutor who told him that he wasn't "supposed to talk about it."

On the other hand, the deposition of Captain H recalls voting more than once, but no more than three times on the Specification to avoid reaching an impasse as a "hung jury." As best he could remember, on the first or second vote "there was one, maybe two that were not in favor of a guilty finding;" however, the "last vote was unanimous." Lieutenant Colonel R could not remember clearly the votes taken, but believed they "voted twice with a break in between there where [they] talked to the Judge;" however, he definitely recalled reaching a unanimous de-cision. Finally Major C stated that the members had voted more than once on the Specification because "the panel—they had some questions—things that weren't answered hadn't been discussed, so [they] had to continue further deliberations to determine if everything [had] been covered." He recalled two or three votes on the Specification, but that the final vote had been unanimous. Major C also recalled one or two votes on the Charge, going through the same process of voting, discussion, and voting, as they had on the Specification. His deposition reveals the reasoning for this process:

> We went through it basically the same as the—the other vote. Any questions they had—the panel was taking this very seriously, and—and we really wanted to make sure, and the individuals wanted to make sure that everything was answered and that all the questions were answered, and everything was done before we finally come (sic) up with a verdict, and that's the reason that—. We felt we had come up to a time that we could possibly vote for a verdict, and yet there was still some questions. Of course, nobody was going to say that until after the vote. They were—they had questions, but they were still in their heads, and they decided that they were gonna [sic] continue on with more delibera-

---

3. Have you discussed these questions or the matters contained within these questions with any other individual besides the officer appointed to take your deposition? If so, with whom have you discussed them, and what was the nature of the discussion?
The Court placed its imprimatur on these questions to ensure that any assertion as to unlawful command influence would be fully aired. In hindsight, although such must always be the Court's concern, the questions posed were insufficiently tailored to the issue before the Court. See United States v. Motsinger, 34 M.J. 255 (C.M.A.1992) (court-martial president's letter petitioning convening authority to exercise clemency because the bad-conduct discharge had been determined on the improper basis of administrative considerations would not be accepted); United States v. Stone, 26 M.J. 401 (C.M.A.1988) (regardless of the method of inquiry into allegations of misconduct by court members, the privilege concerning their deliberations [and underlying Mil.R.Evid. 606(b)] will limit the scope of the inquiry); United States v. Greer, 620 F.2d 1383, 1385, n. 2 (10th Cir.1980) (asking jurors if they followed their instructions or kept their oath impeaches their verdict as much as specific probes into their deliberative processes and are forbidden by Fed.R.Evid. 606(b)); United States v. Martinez, 17 M.J. 916 (N.M.C.M.R.1984) (scope of inquiry into the possibility that superior rank improperly influenced court-martial deliberations is strictly limited to a member's testimony as to objective facts bearing upon the issue and that testimony as to a member's subjective thoughts, impressions, motivations, or emotions is prohibited); cf. United States v. Accordino, 20 M.J. 102 (C.M.A.1985) (affidavits by two court members stating that discussion on the findings had been cut short by the court president were proper matters for examination and could be used to impeach the verdict).

5. Depositions of each of the members were taken with the exception of Master Sergeant T who had retired from the Marine Corps at the time the depositions were taken and who, through counsel, invoked "his personal privilege to allow the deliberations to remain secret."

tions.[6]

### III.

Rule for Courts–Martial (R.C.M.) 922(b)(2) states the procedure for announcing findings in a capital case: "In a capital case, if a finding of guilty is unanimous with respect to a capital offense, the president shall so state [after he has checked the vote count made by the junior member upon collection of the secret written ballots]." The discussion accompanying R.C.M. 922 explains:

If the findings announced are ambiguous, the military judge should seek clarification. *See also* R.C.M. 924. *A nonunanimous finding of guilty as to a capital offense may be reconsidered, but not for the purpose of rendering a unanimous verdict in order to authorize a capital sentencing proceeding.*[7] The president shall not make a statement regarding unanimity with respect to reconsideration of findings as to an offense in which the prior findings were not unanimous.

Discussion, R.C.M. 922(b)(2), Manual for Courts–Martial, United States, 1984 (MCM), Part II at 139 (emphasis added).

The Manual's Appendix 21 contains the drafters' comments on the rule:

*February 1986 amendment:* R.C.M. 922(b) was amended by adding a new paragraph (2) as a conforming change to the amendment in R.C.M. 1004(a) making unanimity on findings a precondition to a capital sentencing proceeding. *The Rule and the Discussion also preclude use of the reconsideration procedure in R.C.M. 924 to change a nonunanimous finding of guilty to a unanimous verdict for purposes of authorizing a capital sentencing proceeding.* Thus, if a nonunanimous finding of

guilty is reaffirmed on reconsideration and the vote happens to be unanimous, the president of the court-martial does not make a statement as to unanimity.

*Analysis,* R.C.M. 922(b), App. 21, MCM, 1984, A21–62 (emphasis added).

The "conforming change," referred to above, is explained in the drafters' comments to R.C.M. 1004(a), which provides court-martial sentencing procedures in cases arising after the Supreme Court decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

*February 1986 Amendment:* .... The new subsection requires a unanimous verdict on findings before the death penalty may be considered.... This is an exercise of the President's powers as commander-in-chief, and is not intended to cast doubt on the validity of the sentence in any capital case tried before the effective date of the amendments.

*Analysis,* R.C.M. 1004(a), App. 21, MCM, 1984, A21–65.

### IV.

Notwithstanding these amendments, Rule for Courts–Martial 922(e) still facially precludes the military judge from questioning the members about their deliberations and voting except as may be permitted in Mil. R.Evid. 606. This rule is based on the requirement in Article 51(a) for voting by secret written ballot and constitutes an intended departure from civilian practice (*see* Fed. R.Crim.P. 31(d)). R.C.M. 922(e), Analysis, App. 21, Manual for Courts–Martial, United States, 1984.

Although neither appellate defense or government counsel has addressed the issue in

---

6. Neither appellate government nor appellate defense counsel has addressed the possibility that the multiple votes taken were the result of "straw polls" taken by the members. *See United States v. Lawson,* 16 M.J. 38 (C.M.A.1983), holding that a "straw poll"—an informal non-binding vote—is not specifically prohibited by the Code and Manual and in some instances may amount to little more than a means for the court members to express their tentative views—which is permissible. The practice is not encouraged, however, and in the event members ask whether such a poll is permissible, the judge must ensure that the poll will not encourage, directly or indirectly,

the use of superiority in rank to influence opinion.

7. As suggested in footnote 1, *supra,* I believe the language employed, "but not for the *purpose* of rendering a unanimous verdict *in order to authorize*" a capital sentencing proceeding signifies no intent on the part of the court-members, but rather the simple preclusion of the death penalty as a potential punishment as a concomitant of that initial nonunanimous vote. (Emphasis added.)

either their pleadings or in argument, I question the applicability of this rule in the death penalty case. The policy underlying the rule shields the members from disclosing whether they voted guilty or not guilty in the context of a system that requires a two-thirds majority to convict. Such is not the situation in death penalty cases where unanimity on the findings of guilty is a prerequisite to imposition of the death sentence. R.C.M. 1004(a)(2). Polling in that context would ensure that *all* members voted for a finding of guilty. Consequently the policy underscoring Fed.R.Crim.P. 31(d) would appear the more applicable. That rule provides that when a verdict is returned by the jury, but before it is recorded, the members of the "jury *shall* be polled at the request of any party or upon the court's own motion (emphasis added)." *Mackett v. United States,* 90 F.2d 462 (7th Cir.1937), cited in the Notes of Advisory Committee on Rules, 1944 Adoption, holds "that the right of a defendant to poll the jury in a criminal case is a substantial one and when denied is error which requires a reversal." *Id.* at 466. The object of the poll is "to ascertain for a certainty that each of the jurors approves of the verdict as returned; that no one has been coerced or induced to sign a verdict to which he does not fully assent." *Id.*

If I am correct that all members may be polled upon request as to their unanimous finding of guilty in a capital case, the natural extension of such a position is that upon request, as here, appellant has the military due process right to a poll on the question whether the unanimous vote of the members was their initial vote as well. Analysis, R.C.M. 922(b), App. 21, MCM, 1984, A21–62. Any denigration of the Discussion or Analysis provisions in the Manual that set forth the prohibition against going forward as a capital case after a nonunanimous finding of guilt has resulted ought not to be countenanced in this of all cases, a death case. Even the lead opinion (at footnote 3) would subscribe to the position that this prohibition has the force of law.

Thus, I would hold that defense counsel, having made the request that he did to poll the members as to the number of times they voted before announcing their verdict, preserved his right to such a poll and that the judge's determination not to permit the exercise of that military due process right constituted reversible error.

## V.

Within his pleadings, appellant stakes his position on the eighth amendment's requirement for a "heightened degree of reliability in any case where a State seeks to take the defendant's life (footnote omitted)." *Darden v. Wainwright,* 477 U.S. 168, 188–89, 106 S.Ct. 2464, 2475, 91 L.Ed.2d 144 (1986) (Blackmun, J., dissenting). In 1988, Justice Marshall pointed out that the awesome severity of a death sentence makes it qualitatively different from all other sanctions, and for this reason, the Supreme Court has emphasized the greater need for reliability in capital cases, *Satterwhite v. Texas,* 486 U.S. 249, 262–63, 108 S.Ct. 1792, 1800–01, 100 L.Ed.2d 284 (1988) (Marshall, J. dissenting) and that this rationale requires that "capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding," citing *Strickland v. Washington,* 466 U.S. 668, 704, 104 S.Ct. 2052, 2073, 80 L.Ed.2d 674 (1984) (Brennan, J., concurring in part and dissenting in part).

Specifically, appellant contends that here the military judge should have instructed the members that they could not reconsider a nonunanimous finding for the purpose of rendering a unanimous verdict, thus enabling a capital sentencing to follow. R.C.M. 922(b), Discussion. He asserts that the plain language of the authorities cited above demonstrates that the court-martial process, by its own rules, requires the government to produce an initial unanimous vote, before an accused is rendered "death eligible" and thus, subject to a capital sentencing hearing. Appellant's ultimate position is that the panel's first vote rendered petitioner ineligible for a death sentence.

The government, on the other hand, perceives no limitation in the Rules for Courts–Martial on the number of votes that may be taken on any finding of *guilty* at any time *prior* to the announcement of that finding in

open court. The government asserts that R.C.M. 922(b)(2) prohibits reconsideration of a nonunanimous vote of guilty only *after that vote* has been announced in open court if the reconsideration is with a view to rendering it unanimous. Because no more than *one* vote on findings was announced, and that one vote reflected a unanimous verdict, the government sees no need for the implementation of R.C.M. 924(b) reconsideration procedures, which presuppose a prior announcement. Additionally, the government submits that R.C.M. 923 prohibits impeachment of the vote at issue on the findings for *any* reason beyond the three categories recited under Mil.R.Evid. 606(b),[8] and that any procedural irregularity with respect to the *manner* in which the vote was conducted would not satisfy any of the three: extraneous prejudicial information, outside influence, or unlawful command influence.

## VI.

At the outset, I would reject the government's contention that the reconsideration procedures of R.C.M. 924(b) presuppose prior announcement of findings in open court. We have been cited to no authority for such an imaginative, but well articulated proposition, nor has our research disclosed any support for this novel idea. In fact, the common practice and understanding of courts-martial practitioners is to the contrary. *See United States v. Perez–Pagan, supra,* 47 C.M.R. at 720 (military judge instructed that the court members could reconsider any finding of guilty before its announcement in open court); Military Judges' Benchbook, Department of the Army Pamphlet 27–9, May 1982, § 2–52 (no reference to announcement of findings as the triggering mechanism for reconsideration procedures, rather only that a finding has been reached and a reballot has

been proposed by any member). In this case, the judge instructed in similar fashion: "After you vote on the Specification of the Charge, the junior member will collect the ballots. They will be reviewed by the President, who will announce the finding.... You of course, may reconsider any finding prior to its being announced in open court." Record at 1466–67. Thus, if we are to accept the depositions of the members, we find that the reconsideration procedures mandated by R.C.M. 924(b) would have been necessary.

## VII.

I turn then to the question whether the court-ordered depositions of the members now should be considered in the resolution of the specified issue *qua* assignment of error. Taking a step back to obtain a broader perspective, the question becomes which interest is paramount—the policy considerations underlying Mil.R.Evid. 606(b) relating to the sanctity of the verdict of a jury (or members) or the heightened requirement for reliability in the death determination process? I begin with the wisdom of Justice Cardozo:

> For the origin of the [juror's] privilege we are referred to ancient usage, and for its defense to public policy. Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world. The force of these considerations is not to be gainsaid. But the recognition of a privilege does not mean that it is without conditions or exceptions. The social policy that will prevail in many situations may run foul in others of a different social policy, competing for supremacy. It is then the function of a court to mediate between

---

8. Mil.R.Evid. 606(b) provides:

*Inquiry into validity of findings or sentence.* Upon an inquiry into the validity of the findings or sentence, a member may not testify as to any matter or statement occurring during the course of deliberations of the members of the court-martial or, to the effect of anything upon the member's or any other member's mind or emotions as influencing the member to assent to or dissent from the findings or sentence or concerning the member's mental process in connection therewith, except that a

member may testify on the question whether extraneous prejudicial information was improperly brought to the attention of the members of the court-martial, whether any outside influence was improperly brought to bear upon any member, or whether there was unlawful command influence. Nor may the member's affidavit or evidence of any statement by the member concerning a matter about which the member would be precluded from testifying be received for these purposes.

them, assigning, so far as possible, a proper value to each, and summoning to its aid all the distinctions and analogies that are the tools of the judicial process.

*Clark v. New York,* 289 U.S. 1, 13, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933).[9]

The surfacing of the possibility of multiple voting on findings in this case, following hard on the heels of *United States v. Mabe,* 30 M.J. 1254 (N.M.C.M.R.1990), *aff'd* 33 M.J. 200 (C.M.A.1991), triggered an immediate and justified quest on the part of both appellate defense and government counsel to fully investigate any hint of unlawful command influence to ensure these trial proceedings were fairly conducted. The interrogatories initially proposed by appellate defense counsel, as enlarged upon by appellate government counsel and adopted by this Court, focused upon this concern, but in hindsight, were insufficiently tailored to recognize the policy considerations underlying Mil.R.Evid. 606(b). Thus, we find ourselves in the paradoxical position of lauding both sides for their sincere desire in laying bare any possibility of improper influence, yet flagellating ourselves for placing our imprimatur upon proposed interrogatories, the scope of which exceeded their intended purpose, no matter their praiseworthy goal.

We recognize that Mil.R.Evid. 606(b), tracking the proscriptions of its Federal Rule counterpart, prohibits a court member from "testify[ing] as to any matter or statement occurring during the course of the deliberations of the members of the court-martial." This rule, protective of the sanctity of juror deliberations and the finality of verdicts, yields to more heightened due process concerns when the question is (1) whether extraneous prejudicial information was improperly brought to the attention of the members, (2) whether any outside influence was improperly brought to bear upon any member, or,

unique to military practice, (3) whether there was unlawful command influence.[10]

The historical underpinnings of the current rule are the subject of both law review and treatise. *See, e.g.,* 8 Wigmore, *Evidence,* §§ 2352–2355 (McNaughton rev. 1961); Crump, *Jury, Misconduct, Jury Interviews, and the Federal Rules of Evidence: Is the Broad Exclusionary Principle of Rule 606(b) Justified?,* 66 N.C.L.Rev. 509 (1988) (hereinafter Crump article); Mueller, *Juror's Impeachment of Verdicts and Indictments in Federal Court under Rule 606(b),* 57 Neb. L.Rev. 920 (1978); Thompson, *Challenge to the Decisionmaking Process: Federal Rule of Evidence 606(b) and the Constitutional Right to a Fair Trial,* 38 Sw.L.J. 1187 (1984); Note, *Impeachment of Verdicts by Jurors— Rule of Evidence 606(b),* 4 Wm.Mitchell L.Rev. 417 (1978).

As the Crump article points out, the first significant federal case to address the admissibility of juror affidavits was *United States v. Reid,* 53 U.S. (12 How.) 361, 13 L.Ed. 1023 (1851), a case involving murder on the high seas. There the affidavits of two jurors stated that each had read a newspaper account of the evidence presented at trial prior to reaching a verdict, but that those accounts had not influenced their decisions. Placing to the side the certified question whether the affidavits constituted competent testimony, the Supreme Court held that because there was nothing in the newspapers calculated to influence the jurors' decision, and interestingly, taking the affidavits at face value, because both jurors had sworn that the papers had not the slightest influence on their verdict, no ground for a new trial lay. The Court declined to fashion any general rule on the admissibility of such affidavits, suggesting only that such evidence "ought always to be received with great caution," but recogniz-

---

9. In *Clark,* the Court held that the admission of testimony as to the conduct of the juror during deliberations was not a denial or impairment of any lawful privilege where the juror had worked a fraud upon the court by concealing her relationship to the defendant. Justice Cardozo distinguishes such privilege from the question of competency of witnesses to testify in impeachment of a verdict.

10. The military rule "recognizes unlawful command influence as a legitimate subject of inquiry and permits testimony by a member on that subject." This additional exception is "required by the need to keep proceedings free from any taint of unlawful command influence and further implements Article 37(a) of the Uniform Code of Military Justice." *Analysis,* Mil.R.Evid. 606(b); MCM (1984), App. 22.

ing that "cases might arise in which it might be impossible to refuse them without violating the plainest principles of justice."

The next major Supreme Court case to consider the issue was *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), in which petitioner faced the death penalty as a result of his murder conviction. In support of his motion for new trial, Mattox offered affidavits of jurors that asserted two types of juror misconduct. The affidavits of two of the members alleged that after the case had been submitted to the jury, the bailiff had advised some number of them that petitioner had previously killed two others. Affidavits from these two jurors, and several others, alleged that members of the jury had read a local newspaper account of the trial during their deliberations. Reversing the district court's decision not to accept the affidavits, the Court recognized the opinion of *Woodward v. Leavitt*, 107 Mass. 453 (1871), as representing the weight of authority on the subject.

[T]he evidence of jurors as to the motives and influences which affected their deliberations, is inadmissible either to impeach or to support the verdict. But a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind.

*Mattox*, 146 U.S. at 149, 13 S.Ct. at 53. The Court believed that the "interests of justice would be served particularly well by an exception [to the common law rule to exclude] that allowed jurors to testify to misconduct in which they had engaged while determining the petitioner's fate in a capital case, because an individual's life was at stake." Crump, S., 66 N.C.L.Rev. at 518.

*Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), is the most recent Supreme Court decision in the area. There the Court granted certiorari to consider whether an evidentiary hearing, to include juror testimony, was required to resolve allegations, presented in the form of juror affidavits, of juror alcohol and drug use during trial. During her extensive review of the legislative history surrounding the passage of Federal Rule 606(b), Justice O'Connor recog-

nized that the Senate Report both criticized and rejected the House version of the Rule.

Although forbidding the impeachment of verdicts by inquiry into the jurors' mental processes, [the House provision] deletes from the Supreme Court version the proscription against testimony 'as to any matter or statement occurring during the course of the jury's deliberations.' This deletion would have the effect of opening verdicts up to challenge on the basis of what happened during the jury's internal deliberations, for example, where a juror alleged that the jury refused to follow the trial judge's instructions or that some of the jurors did not take part in deliberations.

The Court found that "Congress specifically understood, considered, and rejected a version of [the rule] that would have allowed jurors to testify on juror conduct during deliberations, including juror intoxication," such juror intoxication not being an "outside influence" about which jurors may testify to impeach their verdict. *Tanner* 483 U.S. at 125, 107 S.Ct. at 2750; *see also Davis v. United States*, 47 F.2d 1071 (5th Cir.1931) (juror incompetent to testify that improper argument was made by the jurors in the jury room as to defendant's failure to testify, and that it had effect in forming the verdict). In a similar vein, the Third Circuit Court of Appeals has held that even if a juror were unable to hear portions of the evidence, an appellant would not be entitled to post-conviction relief as a matter of law because under Fed.R.Evid. 606(b) the juror would be incompetent to so testify. *Government of Virgin Islands v. Nicholas*, 759 F.2d 1073 (1985).

As noted in the Crump article, however, the *Tanner* decision leaves absent any test for determining what elements in the nature of the allegations of jury improprieties make the difference between irregularities that will qualify as "external" and those that will not. As the article notes, the *Tanner* Court brought the matter full circle by acknowledging that "substantial if not wholly conclusive evidence of incompetency" might qualify as showing external influence. "The opinion in *Tanner* thus leaves open the possibility

that a jury composed of twelve blind drunks at the time of deliberations might be the proper subject of inquiry." Crump, N.C.L.Rev. at 524.

Courts and scholars have recognized exceptions to Federal Rule 606(b) that are not set forth in the rule or its legislative history. These exceptions include situations where a member has committed perjury during voir dire, and more pertinent to our case, where a clerical error has been committed, or in those instances styled as "egregious situations." *Impeachment of Jury Verdicts:* Tanner v. United States *and Beyond,* J. Diehm, 65 St. John's L.Rev. 389 (1991).

The term "common law egregious situation exception" describes the concept that although evidence obtained from a juror may be barred by Rule 606(b), such evidence may be admitted in cases of extreme prejudice. While neither the terms of the exception nor its basis have been clearly defined, support for the doctrine is found in some federal decisions, including those of the United States Supreme Court. In the 1915 case of *McDonald v. Pless,* [238 U.S. 264] [, 35 S.Ct. 783, 59 L.Ed. 1300] the Court ruled that the jurors were incompetent to testify, but noted that "it would not be safe to lay down any inflexible rule because there might be instance in which such testimony of the juror could not be excluded without "violating the plainest principles of justice."

*McDonald* was decided long before Rule 606(b) was enacted, but cases decided since its enactment have indicated that the doctrine enjoys continued vitality. The *Tanner* Court did not specifically adopt the principle, but acknowledged that the common-law egregious situation exception may continue to exist.[11] More recently, the United States Court of Appeals for the Seventh Circuit [in *Shillcut v. Gagnon,* 827

F.2d 1155, 1159 (1987)] noted, "further review may be necessary in the occasional case in order to discover the extremely rare abuse that could exist even after the court has applied [Rule 606(b)] and determined the evidence incompetent."

.... One reason for the courts' continued recognition of the egregious situation exception may be that if the alleged impropriety is so serious as to deny a party due process of law, constitutional requirements will override the specific terms of Rule 606(b).

*Id.* at 423–424 (footnotes omitted) (footnote added). The article continues on to address a second and equally pertinent exception to the general rule of *Tanner:*

The [clerical error] exception is generally viewed as permitting consideration of juror affidavits and other forms of evidence to prove that the verdict was reported erroneously or that the verdict was never agreed upon by the requisite number of jurors. The federal courts have distinguished between the impermissible practice of "interrogat[ing]˙a juror concerning what he meant by his verdict," and the use of a juror's affidavit "to show that the verdict delivered was not that actually agreed upon," which is permitted. The courts have also held that a juror affidavit is admissible "to show the true verdict or that no verdict was reached at all." While these cases were decided before the enactment of Rule 606(b), at least one scholar is of the opinion that the clerical error exception will survive in the federal system.[12] It has also gained acceptance on the state level

*Id.* (footnotes omitted) (footnote added).

A juror is competent to show that a verdict is not the true finding of the jury by reason of a mistake. Devitt, Blackmar, Wolff,

---

11. In reviewing the prior case law, the Court cited with favor the observations made in *United States v. Dioguardi,* 492 F.2d 70, 79, n. 12 (1974): The quickness with which jury findings will be set aside when there is proof of tampering or *external* influence, ... parallel the reluctance of courts to inquire into jury deliberations when a verdict is valid on its face.... Such exceptions support rather than undermine the rationale of the rule that possible *internal* ab-

normalities in a jury will not be inquired into except "in the gravest and most important cases."
(quoting *McDonald v. Pless,* 238 U.S. at 269, 35 S.Ct. at 785).

12. Citing Mueller, *Juror's Impeachment of Verdicts and Indictments in Federal Court under Rule 606(b),* 57 Neb.L.Rev. 920, 958 (1978).

O'Malley, *Federal Jury Practice and Instructions* § 5.16 (1992). Moreover, Fed. R.Evid. 606(b) does not bar testimony by a juror that all of the jurors agree that through inadvertence, oversight, or mistake, the verdict announced was not the verdict on which agreement had been reached. *Continental Casualty Co. v. Howard*, 775 F.2d 876 (7th Cir.1985). And, the affidavit of a juror in a criminal trial is admissible to show that the verdict delivered was not the verdict actually agreed upon. *United States v. Dotson*, 817 F.2d 1127 (5th Cir.), *vacated in part on other grounds*, 821 F.2d 1034 (1987); *accord* 8 Wigmore, § 2355, p. 718 (McNaughton rev. 1961).

Under this second exception to the rule of juror incompetency I would conclude that it was the original nonunanimous vote on the findings of guilt which became the "true" verdict for the purposes of determining whether appellant became death eligible, i.e. the subsequent unanimous verdict read to the court by the members was in error since it was not the critical ballot. Alternatively, one well might conclude on the facts of the case before us that the first exception for egregious situations should apply. Under that view, Mil.R.Evid. 606(b) should not be allowed as a shield to deflect from further review assertions of multiple voting that has resulted in appellant's death sentence without procedural due process of law.

## VIII.

Following the point in the trial after which the military judge responded to the President's question on the members' freedom to reconsider their findings, there is no indication that the members were on notice of the grave significance of their initial vote. In fact, they had only moments earlier been given what amounts to a standard instruction:

Bearing in mind, as I've just said, that a finding of guilty results if at least two-thirds of the members vote for a finding of guilty for the offense before the court. The President, if you find the accused guilty of the offense charged, the President of the court will note whether the vote was unanimous. If the accused was found guilty and the vote was unanimous, the President will announce such unanimity as a part of the announcement of the finding of guilt. If the accused is found guilty, but the vote is not unanimous, no announcement will be made as to lack of unanimity.

Record at 1466. In the absence of instruction as to the law by the judge, court members cannot be presumed to know a technical legal rule of procedure. *United States v. Keith*, 4 C.M.R. 34 (C.M.A.1952).

In *United States v. Greene*, 36 M.J. 1068 (A.C.M.R.1993), our fellow service court was confronted with a similar problem to the one we now face. There the trial judge failed to instruct the members that their voting on a proposed sentence during the course of deliberations "shall be by secret written ballot." On review, the Army Court first distinguished its prior precedent in concluding there was no plain error, and then tested the error for prejudice. Recognizing that if a court votes without using secret written ballots, it is possible for unlawful outside concerns or seniority in rank to influence a member's vote, the Court accepted the government appellate counsel-sponsored affidavit of the junior member of the court that the members had in fact utilized a secret written balloting procedure.[13]

I am not unmindful of the general proposition that the members' collective mental process is not the proper subject of judicial scrutiny, *see Scogin v. Century Fitness, Inc.*, 780 F.2d 1316 (8th Cir.1985);[14] *United*

13. *See also United States v. Jackson*, 34 M.J. 1145 (A.C.M.R.1992), in which the president of the court, after trial, advised the deputy staff judge advocate that the members had failed to follow the judge's instruction to vote on the lightest proposed sentence first. The judge then directed a post-trial session at which the president again acknowledged the error. Without any discussion of the Mil.R.Evid. 606(b) problem, the court held that different members for determining sentence were required.

14. *Scogin* cites *Chicago, Rock Island & Pacific Railroad v. Speth*, 404 F.2d 291, 295 (8th Cir. 1968), for the proposition that "it is well settled that a jury's misunderstanding of testimony, misapprehension of law, errors in computation or improper methods of computation, unsound rea-

*States v. D'Angelo*, 598 F.2d 1002 (5th Cir. 1979) (applying the general rule, but noting that appellant did not claim that the verdict was not unanimous),[15] yet here we searched only for the number of votes taken. I do not seek to know the mental processes of the members as to why multiple votes may have been taken. This is not a case such as *Perez–Pagan, supra,* where the members disregarded the judge's directive to return to the courtroom for further instructions in undertaking the reconsideration process. There, notwithstanding their disregard of the judge's instructions, the members had the legal ability to proceed from their apparent not guilty findings to reach their ultimate determination of guilty. In this case, if a nonunanimous finding of guilty resulted from the initial vote, there was *no longer any legal ability* to move in to the death determining process—no instruction on reconsideration would have permitted such a result.

## IX.

To disregard the depositions we ourselves ordered would prevent what in this case is the only method of proving that appellant has been denied due process by the members' multiple, and initially nonunanimous, voting resulting in appellant's death eligible position. *Cf. United States ex rel. Owen v. McMann,* 435 F.2d 813 (2nd Cir.1970) (after

considering the "nature of what ha[d] been infiltrated [into the jury room] and the probability of prejudice" based upon juror affidavits giving rise to juror testimony as to personal and adverse information known of the defendant by the jurors, found such a probability of prejudice that the verdict was deemed inherently lacking in due process). "The rule of juror incompetency cannot be applied in such an unfair manner as to deny due process." *Schillcutt v. Gagnon,*[16] 827 F.2d 1155, 1159 (7th Cir.1987). In the occasional case, further review may be necessary "in order to discover the extremely rare abuse that could exist even after the court has applied [Rule 606(b)] and determined the evidence incompetent." *Id.*

We have all explored the options in this case, and, having done so, I find none to my liking. To have ordered further hearings under *United States v. DuBay,* 37 C.M.R. 411 (C.M.A.1967) in order to clarify the responses obtained from the depositions would have served only to intrude further on the sanctity of the members' deliberation in the absence of any indication of unlawful command influence. *See, e.g., Sullivan v. Fogg,* 613 F.2d 465 (2nd Cir.1980) (following court-ordered psychiatric examination of juror post-trial, appellant had due process right to cross-examine doctor's opinion of competen-

---

soning or other improper motives cannot be used to impeach a verdict. These matters all inhere in the verdict itself." For a similar treatment of the issue, *see also Farmers Co-operative Elevator Association v. Strand,* 382 F.2d 224, 230 (8th Cir. 1967) (juror affidavit asserting that jurors discussed likelihood of insurance coverage and its effect and that they gave inadequate consideration to and misinterpreted the court's instructions could not be used to impeach verdict).

**15.** The exception to this rule is to be found in *Cook v. United States,* 379 F.2d 966 (5th Cir. 1967) (described as *"sui generis* in federal decisional law" by *United States v. D'Angelo,* 598 F.2d 1002, 1004, n. 3 (5th Cir.1979), citing *United States v. Lee,* 532 F.2d 911 (3rd Cir.1976)). There the jury of twelve returned their verdict of guilty, but appended a note requesting the court to give the defendant "every degree of leniency possible." The judge then polled the jury as requested by counsel for the defendant. Although the first two jurors stated their vote as "guilty," the remaining ten responded, all substantially in the following language, "Guilty, as noted at the bottom of the verdict." Defense

counsel requested that the court inquire of each juror whether that juror's vote was qualified by the note on the bottom. This the court declined to do. Counsel then proposed that the court inquire of the jury whether their votes would be for conviction if they were advised they could not make the recommendation or that the recommendation was not a subject for their consideration. This, the court also declined to do. On appeal, the Fifth Circuit Court of Appeals found that the judge's failure to ask those questions in order to clarify the jury's intent constituted reversible error. That court held that where the circumstances strongly suggest that there would have been no agreement as to the verdict unless the recommendation for leniency were also accepted, the effect of the recommendation, steadfastly adhered to on the poll, was to nullify the verdict.

**16.** *Shillcutt* is the strongest case I have found that notwithstanding its recognition of the public policy considerations underlying Fed.R.Evid. 606(b) and the *Tanner* decision, reserves the trump card of due process in cases writers have styled as "egregious situations."

cy, but not to have juror examined again); *but cf. Smith v. Phillips*, 455 U.S. 209, 222, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring) (in most instances a postconviction hearing will be adequate to determine whether a juror is biased).[17]

I am thus left with a reasonable, if not substantial, doubt as to the reliability of the death-determining process in this case based upon the responses under oath of three of the court members. Article 66(c), UCMJ; *United States v. Cole*, 31 M.J. 270 (C.M.A. 1990). I believe on the facts of this case that the policy considerations expressed within Mil.R.Evid. 606(b) to protect court members from harassment and assuring finality of verdicts must yield to the protection of an accused's constitutionally based due process rights.

Accordingly, I would set aside appellant's sentence of death.

---

**17.** As Crump notes in his article, the *Tanner* decision provides no easy answer in the situation of a juror who manifests racial bias during deliberations. Although racial bias is difficult to classify as either "extraneous" information or an "outside" influence, in egregious cases the juror misconduct may so offend fundamental fairness as to call for an inquiry even though the legislative history of Rule 606(b) would argue for juror privacy. Crump, 66 N.C.L.Rev. at 524.