*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
KISOR, DALY, and MIZER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Austin M. LONGSHORE**
Aviation Electronics Technician First Class (E-6), U.S. Navy
*Appellant*

**No. 202200177**

_____

Decided: 6 February 2024

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Donald R. Ostrom

Sentence adjudged 29 April 2022 by a general court-martial convened at Naval Station Norfolk, Virginia, consisting of officer and enlisted members. Sentence in the Entry of Judgment: reduction to E-1, confinement for 90 days, and a dishonorable discharge.

For Appellant:
*Major Colin W. Hotard, USMC*

For Appellee:
*Major Candace G. White, USMC*
*Colonel Joseph M. Jennings, USMC*

Judge DALY delivered the opinion of the Court, in which Senior Judge KISOR and Judge MIZER joined.

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

DALY, Judge:

A panel of five officers and three enlisted members convicted Appellant, contrary to his pleas, of one specification of committing a sexual act by penetration of Aviation Structural Mechanic Safety Equipment Petty Officer Second Class [AME2] Reed's vulva with his penis without consent in violation of Article 120(b)(2)(A), UCMJ.[1] The members acquitted Appellant of another specification in violation of Article 120(b)(2)(B), UCMJ, for the same act, but committing the sexual act when he knew or reasonably should have known that AME2 Reed was asleep, unconscious, or otherwise unaware that the sexual act was occurring.[2]

Appellant asserts four assignments of error (AOEs): (1) the evidence is not factually sufficient to sustain a finding of guilty; (2) members of the panel committed unlawful command influence during the deliberations process; (3) the members' findings worksheet—lost from the record—renders the record incomplete; and (4) Appellant was entitled to a unanimous verdict.[3] We find no prejudicial error and affirm.

## I. BACKGROUND

### A. Facts relating to the Charge.

*1. Professional and personal relationships of Appellant, (AME2 Reed, Ms.*

_____

[1] 10 U.S.C. § 920(b)(1)(A).

[2] 10 U.S.C. § 920(b)(1)(B).

[3] We have reviewed Appellant's fourth AOE and find it to be without merit. *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987); *see United States v. Anderson*, 83 M.J. 291 (C.A.A.F. 2023); *United States v. Causey*, 82 M.J. 574 (N-M. Ct. Crim. App. 2023).

*Echo, and Aviation Electronics Mate Third Class [AE3] Charlie.*[4]

Appellant and AME2 Reed worked together in Strike Fighter Squadron 122 [VFA-122] at Naval Air Station Lemoore, California, where he served as her lead petty officer, supervisor, and mentor. During this time, AME2 Reed had a boyfriend, Appellant was married, and the two shared only a professional relationship and platonic friendship.[5] Occasionally, they would socialize together with other co-workers outside of work.[6]

Between 2018 and early 2019, AME2 Reed executed a permanent change of station move to Naval Air Station Oceana, Virginia.[7] She rented an off-base apartment, but spent a lot of time at the house of her very close friend, Ms. Echo—a former Sailor with whom AME2 Reed had previously served. Occasionally, AME2 Reed would stay the night at Ms. Echo's house because Ms. Echo's apartment was closer to AME2 Reed's place of work or to avoid driving home after drinking alcohol.[8] AME2 Reed characterized their relationship as being like sisters.[9] She had a key to Ms. Echo's home and was always welcome there because they were "family."[10]

In 2019, Appellant also received orders to Naval Station Oceana, Virginia. Although AME2 Reed offered to let Appellant stay with her at her apartment while he was looking for a place for his family to live, ultimately, this did not happen.[11] While stationed in Virginia, Appellant and AME2 Reed did not work together as they had in California, but they socialized with each other outside of work a couple of times. AME2 Reed considered Appellant a friend, but nothing more.

In April 2019, AME2 Reed and other members of her work section embarked aboard USS TRUMAN (CVN-75) for a short work-up period in advance of the ship's pending deployment. During this work-up period, AME2 Reed

---

[4] All the names in this opinion, other than those of the Appellant, the judges, and counsel, are pseudonyms. AME2 Reed was serving on active duty in the U.S. Navy when sexually assaulted by Appellant. Between the sexual assault and date of trial, AME2 Reed completed her enlistment and separated from the military.

[5] R. at 357.

[6] R. at 357.

[7] R. at 344.

[8] R. at 346.

[9] R. at 345.

[10] R. at 346.

[11] R. at 396.

worked the night shift from 1800 to 0800. While onboard TRUMAN, she reconnected with AE3 Charlie, another friend and former member of her squadron at Naval Station Lemoore, California. The two had become close during the last six months of AME2 Reed's time in California. She saw AE3 Charlie multiple times during the work-up period on TRUMAN.

### 2. *Informal reunion of Appellant, AME2 Reed, and AE3 Charlie.*

On 11 April 2019, after confirming with Ms. Echo, AME2 Reed made plans with AE3 Charlie, "to have a couple of beers and get some food" at Ms. Echo's house.[12] During this time, Ms. Echo's husband—also a Sailor—was deployed. AME2 Reed completed her night shift on TRUMAN and tried to take a nap on the ship until liberty was called, but she was unable to sleep.[13] AME2 Reed departed the ship, went to Ms. Echo's house, and waited for AE3 Charlie to arrive. When he arrived around 1500, it was warm and light outside.[14] They ordered pizza and drank some beer.[15]

While eating and drinking together, AE3 Charlie and AME2 Reed reminisced about their Navy careers and the people they had served with. AE3 Charlie testified that

> [a]t one point in particular—I can't recall when—she had mentioned [Appellant's] name at some point while we were joking around and, yeah, she had mentioned he was stationed [here] and that we ought to see if, you know, he was available. He could, you know, come hang out with us.[16]

AE3 Charlie and AME2 Reed decided to invite Appellant to join them. At 1748, AME2 Reed texted Appellant a picture of her and AE3 Charlie drinking beer and invited him to come over.[17] Appellant responded that he was at work and getting off around midnight.[18] AME2 Reed replied, "Well if you get off and feel like hanging out lemme know. I'm having a bonfire at a friend's place."[19] Appellant did not immediately confirm that he would attend but noted that the

---

[12] R. at 348.

[13] R. at 350.

[14] R. at 352.

[15] R. at 352-53.

[16] R. at 460-61.

[17] R. at 361.

[18] Pros. Ex. 1 at 2.

[19] Pros. Ex. 1 at 2.

location of the house was not close to his place of work, texting, "Eww."[20] AME2 Reed replied, "Eww yourself! Lol. It's like 25 min from base. Not horrible lol."[21]

Ms. Echo arrived home from work around 1900 and began playing a drinking game with AME2 Reed and AE3 Charlie. Appellant texted AME2 Reed at 2038, "Ill see what time we get off."[22] AME2 Reed responded an hour later, "Okiedokie" with two heart emojis.[23] She also sent Appellant a text with Ms. Echo's address and indicated there was beer at the house, but that he could "bring whatever you'd like or you can have some of these, if there's any left :)"[24] Appellant arrived around 2330 with beer, but AME2 Reed asked him to take her to a store for more beer. AME2 Reed described the drive with the Appellant as friendly: "[w]e were joking, catching up."[25]

Ms. Echo described the interaction between Appellant and AME2 Reed as "very civil, very familiar," "friendly," and "[c]atching up with old times, just communicating."[26] When specifically asked if the interaction was flirtatious or if there was any touching, Ms. Echo answered, "no."[27]

AE3 Charlie provided a similar description about the interactions between Appellant and AME2 Reed during that evening: "Seemingly normal, nothing out of place, nothing out of ordinary. Like I said, we were all very well acquainted with each other. . . ."[28] When asked if there were any interactions AE3 Charlie would describe as flirtatious or suggestive, he answered in the negative.[29]

The group of four stayed outside until around 0130, 12 April. AME2 Reed switched to drinking water for "the last couple of rounds because [she] knew

---

[20] Pros. Ex. 1 at 3.

[21] Pros. Ex. 1 at 3.

[22] Pros. Ex. 1 at 3.

[23] Pros. Ex. 1 at 3. When asked about the heart emojis, AME2 Reed testified, "I tend to send heart emojis to people I consider friends or even co-workers sometimes as just a way for me making sure that they understand that I'm sending the message with love. It's an empathetic thing I do." R. at 363.

[24] Pros. Ex. 1 at 3.

[25] R. at 364.

[26] R. at 439.

[27] R. at 439.

[28] R. at 462.

[29] R. at 462.

the amount of alcohol [she] had plus the lack of sleep [from her night shift the previous evening aboard TRUMAN] would not be a good combination."[30] The group sat on the couch talking about multiple subjects and watched a movie.[31] Appellant and AME2 Reed did not sit next to each other.[32]

Eventually the evening began to wind down. At 0246, AE3 Charlie departed Ms. Echo's house via a rideshare back to TRUMAN. AME2 Reed walked AE3 Charlie to his vehicle and then went back inside to retake her seat on the couch. AME2 Reed testified that "[w]e ended up putting on the TV. We put a movie on…[a]nd I fell asleep on the couch."[33] AME2 Reed was wearing one-piece, long sleeve, fleece pajamas that zipped in the front up to the bottom of her neck.[34] Ms. Echo remained on the couch between AME2 Reed and Appellant, and all three eventually fell asleep.[35]

Ms. Echo woke up around 0300, checked the time on her phone, and noted that Appellant and AME2 Reed were asleep.[36] Ms. Echo then turned the television off and went to her bedroom.[37] She described AME2 Reed as "[lying] down . . . [e]yes were closed and she was breathing as if she was asleep, very relaxed."[38]

When AME2 Reed fell asleep during the movie, she had been awake for at least 35 consecutive hours and had consumed 3 to 6 alcoholic beverages.[39] At trial, an expert in sleep medicine, sleep, and sleep disorders opined that AME2 Reed's sleep between 0300 and 0500 was likely a "pretty profound sleep."[40] The expert further testified that it was possible to sleep through being moved, undressed, and sexually penetrated.[41]

---

[30] R. at 364.

[31] R. at 366.

[32] Pros. Ex. 4.

[33] R. at 382.

[34] AME2 Reed described the pajamas as a "onesie." R. at 366-72; Pros. Ex. 5.

[35] R. at 382.

[36] R. at 441.

[37] R. at 442.

[38] R. at 442.

[39] R. at 423, 496.

[40] R. at 496-97.

[41] R. at 498.

*3. Appellant's sexual assault of AME2 Reed.*

At trial, AME2 Reed testified, "The next thing I remember, I'm being woken up by [Appellant], on top of me."[42] She also remembered that, prior to being woken up, she was having a romantic dream about her ex-boyfriend.[43] She remembered in the dream, "[her ex-boyfriend] was touching my waist, and I remember hearing 'Snookie' a lot."[44] "Snookie" was her nickname at VFA-122; her ex-boyfriend did not use it once they started dating, but Appellant did use it.[45] She further testified that the dream felt real, to the point that she could actually feel his fingers and penis inside her vagina.[46] When she woke up and saw Appellant rather than her ex-boyfriend, she "was frozen still."[47] She was wearing a "spaghetti-strap tank top . . . [m]y underwear was pulled to the side and my breasts were exposed and part of my stomach was exposed because [the tank top] was pulled down and partially up, and I believe my onesie was around my ankles or on the floor."[48] AME2 Reed did not know how her onesie had been removed.[49]

Once AME2 Reed froze, Appellant stopped and apologized.[50] AME2 Reed reassured Appellant that "we could still be friends and everything."[51] She later ]explained, "I mean I was scared and I felt completely violated and I was doing everything that I thought was right in order to get him out of there as fast as possible."[52] Appellant left around 0500 after receiving a phone call.[53] AME2 Reed walked him to the door and went back to sleep on the couch.[54] Around 1000, AME2 Reed woke up because she heard Ms. Echo walking around. AME2

---

[42] R. at 382.

[43] R. at 382.

[44] R. at 383.

[45] R. at 383.

[46] R. at 384.

[47] R. at 384.

[48] R. at 386.

[49] R. at 418.

[50] R. at 387.

[51] R. at 388.

[52] R. at 388.

[53] R. at 388.

[54] R. at 389.

Reed testified that Ms. Echo asked "if something was wrong, and in that moment I decided to tell her about what had happened."[55] That afternoon, AME2 Reed went to the Naval Station Emergency Room for a Sexual Assault Forensic Exam.[56]

That day and over the next few days, Appellant called and texted AME2 Reed several times, ultimately apologizing by text. He wrote, "I was just trying to apologize for the other night. I didn't really know what was going on. I'm very sorry for putting you in a weird situation and I hope that we can keep our friendship through this. I see you as one of my good close friends and I don't want to lose that."[57] Additionally, Appellant texted, "I just want you to know that what happened was not what I intended to happen or wanted. I see us as good friends and never wanted to mess that up."[58]

## B. Allegations that various members violated the military judge's instructions during deliberations.

Appellant's court-martial panel consisted of eight members: a commander (O-5), a lieutenant commander (O-4), two lieutenants (O-3), a lieutenant junior grade (O-2), a master chief (E-9), and two first class petty officers (E-6).[59] Prior to opening statements, the military judge instructed the members that "each of you may take notes if you desire and you can use them to refresh your memory during deliberations, but they may not be read or shown to the others."[60] Prior to closing arguments, the military judge instructed the members on Appellant's right not to testify: "You will not draw any inference from the accused's—to the accused from the fact that he did not testify as a witness. The fact that the accused has not testified must be disregarded by you."[61] Following closing arguments, the military judge instructed the members that their deliberations should be preceded by "a full and fair discussion" of the evidence and

---

[55] R. at 390.

[56] R. at 390, 443.

[57] Pros. Ex. 1 at 5.

[58] Pros. Ex. 1 at 5.

[59] App. Ex. XVI at 71; App. Ex. XV at 1.

[60] R. at 326.

[61] R. at 571; s*ee also* App. Ex. XXV at 7.

that they were to vote by secret, written ballot.[62] The military judge provided a written copy of his instructions to members for their deliberations.[63]

On appeal, this Court granted Appellant's motion to attach an affidavit from a panel member alleging that several members violated the military judge's procedural instructions.[64]

## C. Members findings and relevant motions.

Prior to trial, Appellant made a motion for a unanimous verdict.[65] In the alternative, Appellant moved for the panel president to be required to announce whether any findings of guilt was the result of a unanimous vote.[66] The military judge denied the motions.[67]

After the members deliberated, the panel president recorded the findings on the findings worksheet and provided it to the military judge.[68] Before the members announced their findings, the military judge highlighted certain language on the findings worksheet and asked the panel president to confirm that the highlighted portion reflected the intentions of the panel.[69] The panel president then read the findings of the members into the record.[70]

During the presentencing phase of trial, the senior enlisted member wrote a question for the military judge: "After hearing a defense witness, can we revote as a jury to ensure no one changed their opinions?"[71] Trial defense counsel moved to voir dire the member.[72] Citing Rule for Courts-Martial 924, the military judge denied the request to voir dire the member because reconsideration of the findings can only be proposed prior to the announcement in open court

---

[62] R. at 614; *see also* App Ex. XXV at 9.

[63] R. at 616; App Ex. XXV.

[64] *See* Appellant's Motion to Attach dtd 30 Dec 22.

[65] App. Ex. XXVI at 2-3.

[66] App. Ex. XXVI at 3.

[67] R. at 40.

[68] R. at 623.

[69] R. at 623.

[70] R. at 624.

[71] R. at 654; App Ex. XXIV at 3.

[72] R. at 654.

and on the record.[73] Appellant then moved for a mistrial.[74] The military judge denied that motion.[75]

Additional facts necessary to resolve Appellant's AOEs are set forth below.

## II. DISCUSSION

### A. The evidence adduced at trial is factually and legally sufficient.

Appellant contends that the evidence is factually insufficient to support a conviction. We also review this (and every) case for legal sufficiency.

*1. Standards of review.*

a. Legal sufficiency.

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution."[76]

b. Factual sufficiency.

In evaluating factual sufficiency for cases where the alleged misconduct occurred before 2021, we determine "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witness, [we] are . . . convinced of [Appellant's] guilt beyond a reasonable doubt."[77] In conducting this unique appellate function under the version of Article 66, UCMJ, applicable to this case, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[78]

---

[73] R. at 654-56.

[74] R. at 656.

[75] R. at 660.

[76] *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see United States v. Gutierrez*, 73 M.J. 172, 175 (C.A.A.F. 2014).

[77] *Turner*, 25 M.J. at 325.

[78] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict."[79]

*2. The evidence in this case.*

To prove Appellant sexually assaulted AME2 Reed by penetrating her vulva with his penis without consent, the Government had to prove beyond a reasonable doubt that Appellant: (1) committed a sexual act upon AME2 Reed and (2) did so without AME2 Reed's consent. Additionally, because the evidence raised mistake of fact, the Government had to prove beyond a reasonable doubt (3) that Appellant was not reasonably mistaken that AME2 Reed consented to the sexual act. Appellant does not challenge the first or second elements, focusing his argument only on mistake of fact.

Appellant contends the evidence supports that he honestly and reasonably believed AME2 Reed consented. In support of this argument, Appellant characterizes AME2 Reed's behavior as "flirtatious pursuit" of him both before and during the night of the assault.[80] This characterization appears to be based on AME2 Reed inviting Appellant to move in with her while he was house-hunting; encouraging him to come to Ms. Echo's house on the night of the assault, using heart emojis in her text message, what Appellant describes as "flirtatiously greeting Appellant; and, immediately having him drive her to the store to carve out time to be alone."[81] Appellant also points to AME2 Reed's sexual dream and asserts that she placed her arms around him during the sexual act.[82] Appellant further asserts that, prior to the sexual act, "[f]oreplay ensued, and her tight-fitting onesie came off."[83]

Having reviewed the Record in its entirety, we find Appellant's characterization of the evidence is neither reasonable nor supported by the Record. No

---

[79] *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

[80] Appellant's Br. at 13.

[81] Appellant's Br. at 15-16.

[82] Appellant's Br. at 13.

[83] Appellant's Br. at 16.

testimony or other evidence was presented at trial that AME2 Reed flirtatiously pursued Appellant.[84] There is also no evidence that AME2 Reed's pajama onesie was "tight-fitting." To the contrary, it was described repeatedly as "baggy."[85]

AE2 Charlie and Ms. Echo testified about the events leading up to the assault, including the interactions between AME2 Reed and Appellant that evening; neither saw anything they would describe as flirtatious.[86] At the end of the night, when watching a movie, Ms. Echo sat between AME2 Reed and Appellant on the couch; there was no flirtation or foreplay. When Ms. Echo left AME2 Reed and Appellant asleep on the couch, they were both fully clothed and not touching. Then, when AME2 Reed awoke, she was in a state of undress, Appellant was on top of her, and his penis was inside her vagina. AME2 Reed testified regarding her actions upon waking: she froze and her demeanor changed, causing Appellant to stop the sexual act.[87] AME2 Reed testified this sexual act was without her consent. There was no evidence to the contrary.

After weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt of Appellant's guilt. Thus, the evidence is factually sufficient to sustain the conviction. It is also legally sufficient.

## B. The member's affidavit does not raise "some evidence" of unlawful command influence.

Appellant argues for us to pierce the members' deliberations and consider a member's affidavit as evidence of unlawful command influence.[88]

### 1. Applicable law.

Unlawful command influence—long considered the "mortal enemy of military justice,"[89]—is prohibited by Article 37, UCMJ, which provides in pertinent

---

[84] R. at 439, 462.

[85] R. at 367, 370-71. This is yet another example of counsel who practice before this Court mischaracterizing the evidence in the Record. *See, e.g, United States v. Mencias,* 83 M.J. 723, 733 n. 66 (N-M. Ct. Crim. App. 2023); *United States v. Tapp,* 83 M.J. 600, 611 (N-M. Ct. Crim. App. 2023).

[86] R. at 432-75.

[87] R. at 387.

[88] Appellant's Motion to Attach dtd 30 Dec 22 at Appendix A.

[89] *United States v. Thomas,* 22 M.J. 388, 393 (C.M.A 1986).

part: "No person subject to this chapter may attempt to coerce or, by an unauthorized means, attempt to influence the action of a court-martial . . . or any member thereof, in reaching the findings or sentence in any case . . . ."[90] We review allegations of unlawful command influence de novo.[91] As set forth in *United States v. Biagase*, an accused who raises a post-trial claim of unlawful command influence bears the initial burden to: "(1) show facts which, if true, constitute unlawful command influence; (2) show that proceedings were unfair; and (3) show that the unlawful command influence was the cause of the unfairness."[92]

Use of rank by a member during deliberations "in any manner in an attempt to control the independence of members in the exercise of their judgment" is unauthorized and a form of unlawful command influence.[93]

It is a low threshold to raise the issue, even on appeal: there must be "more than mere allegation or speculation," but all that is required is "some evidence" to support the three *Biagase* prongs.[94] Once an appellant meets this threshold, a far higher burden shifts to the Government; it must prove beyond a reasonable doubt that: (1) the predicate facts do not exist; or (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence had no prejudicial impact on the court-martial.[95]

However, any inquiry into alleged wrongdoing during the members' deliberative process is sharply constrained. Military Rule of Evidence [Mil. R. Evid.] 606(b) generally prohibits inquiry into three areas: (1) "any statement made or incident that occurred during the deliberations of that court-martial"; (2) "the effect of anything on that member's or another member's vote"; or (3) "any member's mental processes concerning the finding or sentence."[96] The Rule carves out three exceptions, one of which is that a member may provide evidence about whether "unlawful command influence or any other outside influence was improperly brought to bear on any member."[97] The "exercise of the

---

[90] Art. 37(a)(2), UCMJ.

[91] *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013).

[92] *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999).

[93] R.C.M. 921(a); *United States v. Accordino*, 20 M.J. 102, 105 (C.M.A. 1985); *United States v. Lawson*, 16 M.J. 38, 40 (C.M.A. 1983).

[94] *Id.*

[95] *Id.* at 151.

[96] Mil. R. Evid. 606(b)(1).

[97] Mil. R. Evid. 606(b)(2)(B).

influence of [one member's] rank on [other] members of the court would fall within this exception."[98] But even when this exception is triggered, limitations remain. The exception allows inquiry into objective manifestations of impropriety, but inquiry into subjective effects of alleged impropriety remain prohibited.[99] This allows inquiry into Mil. R. Evid. 606(b)'s first generally-prohibited area (statements made of incidents occurring during deliberations), but the remaining two (effect on a member's vote and mental processes) are subjective and thus remain off-limits.[100] Stated succinctly: "Even when the exceptions to [Mil. R. Evid.] 606(b) are triggered, disclosures should be limited to the fact and nature of the extrinsic evidence; the impact of the extrinsic evidence or influence on the deliberations or voting should not be disclosed."[101]

This overrides the opportunity the Government usually gets under *Biagase* to demonstrate a lack of prejudicial impact. "[W]hen unlawful command influence has been directed at the court members, the Government's third option under *Biagase* is limited by Mil. R. Evid. 606(b)."[102] Instead, courts presume prejudice from improper influences, which the Government has the burden to rebut.[103] Even still, any evidence, rebuttal or otherwise, must relate to objective manifestations of alleged impropriety and may not pertain to any subjective effect it had on members' votes or mental processes.[104]

### 2. *The affidavit in this case.*

Here, we granted Appellant's motion to attach the member's affidavit for the limited purpose of determining if unlawful command influence was injected into the deliberations. Because Mil. R. Evid. 606 limits our consideration to only statements made or incidents that occurred during deliberations, we may only consider the following portions of the member's affidavit:

> The member was the most junior member on the panel.

---

[98] *United States v. Carr*, 18 M.J. 297, 302 (C.M.A. 1984).

[99] *United States v. Dugan*, 58 M.J. 253, 259-60 (C.A.A.F. 2003).

[100] *United States v. Harvey*, 64 M.J. 13, 22 (C.A.A.F. 2006); *Dugan*, 58 M.J. at 259. Subsequent to the *Harvey* and *Dugan* decisions, Mil. R. Evid. 606(b), was amended to break up prohibited areas from two into three; these changes, however, were "stylistic" and do not impact our analysis.

[101] *United States v. Straight*, 42 M.J. 244, 249 (C.A.A.F. 1995).

[102] *Dugan*, 58 M.J. at 259.

[103] *Straight,* 42 M.J. at 249.

[104] *See Dugan*, 58 M.J. at 259.

> Prior to discussing evidence, the panel conducted an informal vote on the findings.

> Shortly after deliberations began, the senior member read portions of his notes aloud. Other members then shared their notes and read portions of them to other members.

> One member commented that "as servicemembers, we have a duty to send a message that sexual assault is not tolerated in the Navy," "we have a duty to the victim," and "imagine if she was your daughter" or words to that effect. A similar message was repeated during deliberation on the sentence.

> The second most senior member stated that Appellant showed a guilty demeanor, commented on Appellant's decision not to testify, and shared that he observed Appellant smiling during the trial.

We hold this information does not constitute "some evidence" of unlawful command influence. It fails to meet the threshold requirement under *Biagase* to shift the burden to the Government, because there is insufficient evidence that any of these alleged statements improperly influenced or "coerce[d] a subordinate to vote in a particular manner."[105]

"Senior ranking court members, like their juniors, are free to express their opinions in the strongest terms and to engage in the most robust discussions without fear of retribution or appellate sniping."[106] *United States v. Accordino* involved affidavits from two members who alleged the court-martial president halted discussion on certain issues and called for a vote. Noting that court-martial presidents have "discretion to call for a vote when, in their judgment, discussion of the issues is complete or further debate would be pointless," the Court of Military Review found the affidavits in that case did not indicate unlawful command influence.[107]

Similarly, in *United States v. Lawson*, the Court of Military Review found "straw polls"—informal, non-binding votes—permissible to aid discussions so long as all members understand in advance the informal, non-binding nature of the vote.[108] Our superior court cautioned that this practice should not be

---

[105] *United States v. Loving*, 41 M.J. 213, 238 (C.A.A,F. 1994) (quoting *Accordino*, 20 M.J. at 105)

[106] *Accordino*, 20 M.J. at 105.

[107] *Id.*

[108] *Lawson*, 16 M.J. at 41.

encouraged, but noted no concerns in that case that the "[court-martial] president might compel re-balloting until the members reach a result satisfactory to himself."[109] Thus the use of straw polls is not prohibited and does not, itself, constitute reversible error.[110] In such cases, the informal vote must be analyzed to determine "whether such a procedure enhances perceptibly the risk that prohibited influence 'of superiority in rank' will affect the outcome of the deliberations."[111]

The facts here are distinguishable from *United States v. Dugan*, where the United States Court of Appeals for the Armed Forces remanded the case for a fact-finding hearing after finding a member's letter constituted some evidence of unlawful command influence.[112] That appellant was convicted of wrongful use of ecstasy, among other things.[113] In her letter, the member raised her concerns about "'the mention of a recent Commander's Call in which the [the convening authority] was said to have discussed the increasing problem of Ecstasy use[.]'"[114] The member wrote:

> [A] panel member reminded us that our sentence would be reviewed by the convening authority and we needed to make sure our sentence was sending a consistent message. Another member pointed out that we needed to make sure it didn't look like we took the charges too lightly because those reviewing our sentence wouldn't necessarily be aware of the mitigating factors. He or she said it was especially important because our names would be identified as panel members.[115]

Our superior court found the member's letter was more than mere speculation as it was "detailed" and "based on her own observations."[116]

In this case, Appellant has failed to present any evidence that the alleged informal vote was completed in a way so as to improperly influence the vote of

---

[109] *Id.*

[110] *Id. See also United States v. Thomas*, 39 M.J. 626, 639 (N-M. Ct. Crim. App. 1993); *United States v. Leroux,* No. 200201145, 2006 CCA LEXIS 338 at *4 (N-M. Ct. Crim. App. Dec. 21, 2006) (unpublished); *Loving*, 41 M.J. at 238.

[111] *Lawson*, 16 M.J. at 40.

[112] *Dugan*, 58 M.J. at 254.

[113] *Id.* at 253.

[114] *Id.* at 255.

[115] *Id.*

[116] *Id.* at 259 (citing *United States v. Baldwin,* 54 M.J. 308, 311 (C.A.A.F. 2001)).

the members or otherwise impact the outcome of the deliberations. To the contrary, the informal vote process reported by the member in her affidavit is akin to that found permissible in *Lawson* and its progeny. There is no evidence of unlawful command influence based on the use of an informal poll during deliberations. Accordingly, we do not find evidence of undue command influence.

**C. The missing completed findings worksheet does not render the record of trial incomplete.**

*1. Applicable law.*

 "A 'complete record' is not necessarily a 'verbatim record.'"[117] In fact, not all omissions render a record incomplete. However, where an omission from the record of trial is substantial, it raises a presumption of prejudice that the Government may rebut.[118] We review questions of law de novo.[119]

All the requirements for a complete record are listed in section (b) of Rule for Courts-Martial 1112. Specifically, a record must include, "[e]xhibits, or if permitted by the military judge, copies, photographs, descriptions of any exhibits that were received in evidence and any appellate exhibits."[120]

*2. The missing completed findings worksheet in this case.*

In this case, the completed findings worksheet, listed as Appellate Exhibit VI, is a blank copy.

Appellant's court-martial adjudged a dishonorable discharge, triggering a requirement for a "complete" record of trial including a verbatim record of the proceedings and all exhibits.[121] The Government has informed the Court that the completed Findings Worksheet cannot be found despite its best efforts.[122] Appellant argues it is a substantial omission of the record of trial that renders

---

[117] *United States v. McCullah*, 11 M.J. 234, 236 (C.M.A. 1981) (quoting *United States v. Whitman*, 3 C.M.A. 179, 11 C.M.R. 179, 181 (C.M.A 1953)).

[118] *United States v. Gray,* 7 M.J. 296, 298 (C.M.A. 1979); *United States v. Embry*, 60 M.J. 976, 979 (Army Ct. Crim. App. 2005).

[119] *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F. 2000).

[120] Rule for Courts-Martial 1112(b)(6).

[121] Art. 54, UCMJ.

[122] Appellee's Response to Court Order to Produce Findings Worksheet of 20 Dec 22.

the record incomplete as an appellate exhibit, even though a "Findings Worksheet" is not explicitly included as a document required by the rule.[123] We disagree with Appellant.[124]

We find the omission of the completed Findings Worksheet is neither substantial nor prejudicial. There is ample evidence elsewhere in the record reflecting the contents of the findings worksheet. The court-martial announced the findings in open court after the military judge highlighted certain language on the findings worksheet and asked the senior member to confirm that the highlighted portion reflected the intentions of the panel.[125] The announced findings were clear.[126] In this regard, we also note trial defense counsel did not object to (or otherwise note any confusion about) the announced findings.[127] Accordingly, we hold that the absence of the completed Findings Worksheet is not a substantial omission from the record. Thus, Appellant's record of trial is complete, and any error in omitting the findings worksheet was harmless.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[128]

The findings and sentence are **AFFIRMED**.



FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[123] Gov't Br. at 31.

[124] *See United States v. Baird*, 2007 CCA LEXIS 562 at *4 (N-M. Ct. Crim. App. 2007) (unpublished); *United States v. Rodriguez*, 2005 CCA LEXIS 245 at *11 (N-M. Ct. Crim. App. 2005) (unpublished).

[125] R. at 623.

[126] R. at 623.

[127] R. at 624.

[128] Articles 59 & 66, UCMJ.